# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. McLaurin*, 2012 IL App (1st) 102943

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARKELL McLAURIN, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-10-2943 |
| Filed | December 10, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In the absence of a record sufficient for a proper evaluation of defendant's claim that his counsel was ineffective in failing to investigate and secure the testimony of a witness, defendant's case was remanded so the trial court could make an inquiry that would satisfy *Krankel*. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-15116; the Hon. Michael Brown, Judge, presiding. |
| Judgment | Remanded with directions. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and John Koltse, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Amy Watroba Kern, and Yvette Loizon, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion. |
| | Presiding Justice Hoffman and Justice Karnezis[1] concurred in the judgment and opinion. |

**OPINION**

¶ 1 This case arises from a September 17, 2010 order entered by the circuit court of Cook County, which denied defendant Markell McLaurin's (McLaurin) *pro se* posttrial claims for ineffective assistance of counsel and motion for a new trial.

¶ 2 After a jury trial, McLaurin was found guilty of first-degree murder and was found to have discharged the firearm that proximately caused the death of Demarlon Jernigan (victim). 720 ILCS 5/9-1 (West 2008). During the hearing on his posttrial motion for a new trial, McLaurin requested a new attorney and, acting *pro se*, raised claims of ineffective assistance of defense counsel. The trial court rejected McLaurin's claims, and after hearing arguments in aggravation and mitigation, sentenced McLaurin to 60 years in the Illinois Department of Corrections.

¶ 3 In this direct appeal, McLaurin argues that: (1) defense counsel was ineffective because counsel should have secured the testimony of eyewitness Timothy Williams through section 3 of the Uniform Act to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings (Witness Attendance Act) (725 ILCS 220/3 (West 2008)), after Timothy Williams failed to appear at a prior proceeding; (2) defense counsel was ineffective for failing to object to the admission of, and failing to request the redaction of, inadmissable statements in State witness Marlon Williams' prior written statement and grand jury testimony; (3) the trial court abused its discretion when it allowed the jury to receive and review a portion of witness Marlon Williams' prior written statement, because it contained other-crimes evidence disclosing that McLaurin "carries different types of guns"; and (4) the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2001)

---

[1] Justice Karnezis participated in the decision of this appeal prior to the expiration of his assignment to the Illinois Appellate Court.

because it did not "provide each juror an opportunity to respond" to specific questions regarding McLaurin's presumption of innocence, the burden of proof on the State, and McLaurin's right to not be penalized if he did not testify in his own defense. McLaurin requests a new trial, or in the alternative, that the case be remanded for the appointment of new counsel to investigate further his posttrial claims of ineffective assistance of defense counsel.

¶ 4    For the following reasons, we remand the case to the circuit court of Cook County for the court to conduct an adequate inquiry into the defendant's *pro se* claims of ineffective assistance of counsel.

¶ 5                                              BACKGROUND

¶ 6    On January 9, 2008, the victim died of multiple gunshot wounds on the street in the area of Pulaski Rd. (Pulaski) and Division St. (Division) in Chicago. After an investigation, the police arrested McLaurin, who was charged with six counts of first-degree murder related to the shooting. On February 1, 2010, before McLaurin's trial was set to commence, defense counsel sought a continuance stating that he was unable to locate defense witness Timothy Williams. The State, also interested in Timothy Williams, informed the trial court that it desired to subpoena him, but had been unsuccessful in serving him at his last known address. Defense counsel stated that he had not subpoenaed Timothy Williams and told the trial court that he had "no excuse other than schedule and workload" for not serving Timothy Williams with a subpoena prior to the trial date. Defense counsel made a proffer that Timothy Williams would testify that neither McLaurin nor State witness Bruce Jackson was at the scene of the shooting. Defense counsel also stated that Timothy Williams was unable to identify the actual shooter. The trial court granted the continuance until March 8, 2010, stating that McLaurin deserved to have a lawyer who would investigate his case, and further commented that defense counsel's efforts to locate Timothy Williams up to that time were "not due diligence."

¶ 7    On March 8, 2010, McLaurin's jury trial commenced in the circuit court of Cook County. On March 10, 2010, after the State rested its case-in-chief, the trial court questioned defense counsel about whether Timothy Williams would testify. Defense counsel informed the trial court that Timothy Williams had contacted him the prior morning stating that he was in Chicago, and that he would testify, but then Timothy Williams subsequently left a message indicating that he needed a ride to court. Defense counsel received Timothy Williams' message when the trial broke for lunch and defense counsel attempted to return Timothy Williams' call multiple times that day. Defense counsel told the court that Timothy Williams did not answer the telephone. Timothy Williams ultimately did not appear in court that day or at any time during the trial. When the trial court asked defense counsel if he had subpoenaed Timothy Williams, defense counsel responded, "he did not tell me where he was, and I did not have time to secure an investigator to locate him in Iowa, I believe he stated [*sic*] he was living." The following day, defense counsel indicated that Timothy Williams had not contacted him. Defense counsel concluded that he would not be present in court. The case then proceeded to closing argument. On March 12, 2010, the trial court declared a

mistrial after the jury was hung and could not reach a verdict.

¶ 8    On June 7, 2010, McLaurin's second jury trial began. Both sides agreed to adopt the trial court's ruling on the motions *in limine* from the first jury trial, in which the court ruled that evidence of the victim's gang membership was inadmissible. There was no further discussion in the second trial concerning whether Timothy Williams would appear as a defense witness. Defense counsel indicated there would be no changes to his witness list from the previous trial, and the trial court informed the venire that Timothy Williams was a potential witness in the case.

¶ 9    During *voir dire*, the trial court instructed the venire about McLaurin's presumption of innocence, that the burden of proof in the case was on the State, and that McLaurin was not required to prove his innocence or testify. The trial court then asked the venire whether they "had any problems" with these principles. Additionally, the trial court asked, "[i]f the defendant decides not to testify, is there anyone here who believes that regardless of what I have just said, you would hold that decision against the defendant?" None of the members of the venire answered in the affirmative.

¶ 10    The State's first witness, Jackee Suttle, testified that she was the girlfriend of the victim and on January 9, 2008, the two met, intending to go to a restaurant together near Division and Pulaski at around 9 p.m. They also had plans to meet Bruce Jackson, a friend who was going to prison the next morning. While conversing with friends near the restaurant, the victim became involved in a verbal altercation with a "big heavy guy." The two headed to a nearby park and engaged in a fistfight. The victim left the park after the fight in a vehicle driven by his friend, Timothy Williams, and returned to the Division and Pulaski area around 10 p.m. Suttle observed the victim outside the restaurant, walking toward a liquor store across the street from the restaurant. Suttle was still in the restaurant, when she heard "five or six" shots fired. Suttle walked outside and observed the victim running away on Division. She observed the victim "taking bullets" and "getting shot," but did not observe the shooter.

¶ 11    In this second trial, Suttle testified that she did not observe Timothy Williams or the "big heavy guy" at the crime scene, even though she had testified in the first trial that both were present at the scene of the shooting. Suttle also testified that she did not observe Bruce Jackson at the crime scene that night, but could not say for sure that Jackson was not there, because her attention was focused on her wounded boyfriend. After the victim was shot, she went over to his wounded body, which was near the bus stop at Division and Pulaski. His body was covered by a brown jacket, but he had been wearing a red jacket when she was with him earlier in the day. When the ambulance arrived, Suttle did not ride in the ambulance with the victim because the police told her to come to the police station. She went to the police station but did not talk to the police that night because she was upset. She returned to the police station a week and a half later.

¶ 12    The State's second witness, Bruce Jackson, testified that his relationship with the victim was "something like brothers" and that they were together every day. The night of the shooting, he dropped the victim off at Division and Pulaski "in the evening or something like that" and did not hear from the victim for "two or three hours, something like that." The victim called him because "[h]e had said that he was out there and some boys was trying to

-4-

fight him or something like that, he didn't want to fight them." Jackson drove to the Division and Pulaski area to pick up the victim, and parked his vehicle on Pulaski. Jackson approached the victim as he was crossing the street to enter the liquor store. Jackson "was walking right behind [the victim]" at a distance of "just like a few feet, couple of feet." There were people by the liquor store, and after Jackson and the victim "[m]ade it by the liquor store," Jackson started hearing shots and observed everyone running around. Jackson then observed the gun, which looked like a revolver and was "chrome or a silver like" with a black handle. He also observed the shooter's face in good light from a "car length" away. In the courtroom, Jackson identified McLaurin as the shooter. Jackson testified that he ran away when the shots first rang out, but he also testified that he observed McLaurin shoot the victim. He heard four or five shots, and he chased the shooter for awhile until he eventually ran into police officers who had arrived at the scene. He told the police officers which way the shooter ran, but the police did not pursue the shooter any further. Instead, the police attended the wounded victim. Jackson did not talk to the police about the shooter's identity on the night of the shooting because he was upset and was mad at the police for not pursuing the shooter more vigorously.

¶ 13    Jackson further testified that he drove to the hospital the night of the shooting and was at the hospital when the victim died. The next morning, on January 10, 2008, he turned himself in to the Illinois Department of Corrections, to serve his sentence. However, he did not speak to the police until April 1, 2008, even though he was released in "mid-March" 2008. He went to the police station "because the police kept coming to my house looking for me and I wanted to know what they was looking for me for." Jackson testified that at the police station on April 1, 2008, he identified McLaurin after a discussion with detectives. On July 10, 2008, he identified McLaurin in a lineup.

¶ 14    The State then called Marlon Williams,[2] who testified that he was currently in the custody of the Stateville Correctional Center, serving time for a 2009 conviction for aggravated unlawful use of a weapon. He then testified that he was not in the Division and Pulaski area in 2008 when the victim was shot. He did not know the victim and he did not observe a person shot on January 9, 2008. Marlon Williams also did not remember giving a written statement on February 22, 2008, to Assistant State's Attorney Beth Pfeiffer (ASA Pfeiffer) and police detective Roger Sandoval (Detective Sandoval) about what he observed on the night of January 9, 2008. He claimed the signature on the statement presented to him in court was not his. Moreover, he did not remember signing the document, having it read back to him, or testifying in front of a grand jury.

¶ 15    Marlon Williams further testified that he was stopped by police on January 30, 2008, and the police kept talking to him about a shooting that had occurred at Pulaski and Division. He claimed that the police were questioning him about the shooting because he had a prior conviction. During the conversation with the police, they described the shooting to him. He talked with the police about the shooting because he believed there was a possibility that if

---

[2]The record does not disclose the relationship, if any, between Marlon Williams and Timothy Williams.

he cooperated, the unrelated case for which he had been arrested would go away. Specifically, the officers told him that "they was going to quit bothering me, talking about I was–something about a home invasion or something like that I had nothing to do with or knew anything about." Marlon Williams testified that the officers also told him that they could make things disappear if he helped them, although he said that police always say things like that, even if they have no intention of actually helping.

¶ 16    The State then called Emmanuel Bass, who testified that he was in the custody of the Stateville Correctional Center where he was serving a six-year sentence for delivery of a controlled substance. On January 9, 2008, he was in the area of Division and Pulaski "selling weed." He was in the area when the victim was fighting in a park near Division and Pulaski. Bass testified that the victim was in a fistfight with a man named "Reesie." He did not observe who won, but observed that the victim walked out of the park and left the area, then returned about 20 minutes later. Bass recalled testifying before the grand jury that the victim knocked Reesie out. Bass testified that Reesie was drinking after the fight and remained in the area. Bass testified that he did not observe McLaurin walk up to the victim and start shooting. However, during this second trial testimony, the prosecutor asked Bass to read excerpts from his grand jury testimony. Bass read portions of his grand jury testimony that indicated that he had previously testified that he did observe McLaurin shoot the victim. Bass said he recalled his testimony before the grand jury that he observed McLaurin shoot the victim, but testified at the second trial that he heard about the shooting from people in the neighborhood. When asked at the second trial about his grand jury testimony, Bass explained that much of it was not true:

"MR. MIRAGLIA [defense counsel]: So essentially everything that Miss D'Souza [assistant State's Attorney] just read to you as far as your testimony at the grand jury, it's not true, is it?

MR. BASS: It's not nothing that I seen. I only know about the fight, yeah, but the rest, the shooting and all that, I didn't witness that."

¶ 17    Bass further testified that Detective Sandoval promised him that he would be released from jail if Bass told the detective what he had heard from the neighborhood. In his grand jury testimony, Bass testified that no promises were made to him. Bass testified at the second trial that he did not recall testifying before the grand jury that no promises were made to him. Bass testified that after his grand jury testimony, he told his defense counsel, who was an assistant public defender, to contact the State's Attorney to tell her that Detective Sandoval promised him that he would be released if he told the grand jury what the police wanted. Bass explained that he did not tell the State's Attorney before the grand jury proceeding because he was worried that he would lose the deal he made with Detective Sandoval. Detective Sandoval had told him not to say anything about the promise. Bass did not receive any help after his grand jury testimony and subsequently was sent to jail to serve the rest of his six-year term.

¶ 18    The State then called ASA Pfieffer, who testified that on February 22, 2008, after meeting with detectives, she met with Marlon Williams to hear what he had to say about the shooting. ASA Pfieffer did not want Marlon Williams to be under the impression that their

conversation would lead to anything regarding his pending case. She denied speaking to him about his pending case, and also denied that Detective Sandoval, who was present at the meeting, spoke to him about his case. She obtained Marlon Williams' written statement where he explained "what he heard said a couple of days after the murder" of the victim.

¶ 19        ASA Pfeiffer further testified that Marlon Williams' written statement explained that no threats or promises were made to him in exchange for the statement. Regarding the night of January 9, 2008, Marlon Williams' statement explained that around 8 p.m., he was with McLaurin and others when he observed the victim and Reesie in a fight over a girl. After the fight, the victim left the area but Reesie remained nearby. About 45 minutes later, Marlon Williams was standing near Division and Pulaski and he observed the victim and friends walking across the street toward a liquor store. Then, Marlon Williams heard someone say, "he's got a banger on him." Marlon Williams then heard some gunshots in front of the liquor store and observed McLaurin holding a gun with fire coming out of it. The victim was running away from McLaurin, but McLaurin followed him and fired a total of six to eight shots at him. After the shooting, McLaurin placed the gun in his waistband and fled the scene. The written statement also stated that Marlon Williams had "seen [McLaurin] with a gun before. [McLaurin] carries different types of guns, 9 millimeters, automatics and revolvers." The statement also said:

> "A day and half later Marlon saw [McLaurin] in the same area Marlon had been on January 9, 2008, on Keystone and Thomas. Marlon was in a car with [McLaurin], Little Joe, and another guy Marlon did not know. The guy Marlon did not know told [McLaurin], 'yeah you stretched buddy' to [McLaurin] and everyone was laughing. [McLaurin] just sat back looking and nodding his head. By saying 'you stretched buddy,' that means he killed him. That's the last time Marlon saw [McLaurin]."

¶ 20        As Marlon Williams' written statement was admitted into evidence and published to the jury in the second trial, defense counsel objected to the portion of the statement that described McLaurin carrying other guns, on the grounds that it was inadmissible other-crimes evidence. The State responded that it had no objection to refraining from reading that portion of the statement to the jury. The trial court ruled that when the written statement was given to the jury, there would be no alterations because Marlon Williams' testimony raised the issue of whether he had actually signed the document. The trial court also rejected defense counsel's request to alter the document to exclude the portions regarding other-crimes evidence because such evidence is admissible for "any other purpose than propensity." Ultimately, the State did not have the objected portion of the written statement read to the jury. However, it was not redacted from the written statement given to the jury.

¶ 21        The State then called Assistant State's Attorney Mary Anna Planey (ASA Planey), who testified that she spoke to Bass on March 10, 2008, about the events of January 9, 2008, at Division and Pulaski. ASA Planey read parts of Bass's grand jury testimony. The portions she read were the same as the portions about which Bass was questioned in his earlier testimony. Specifically, ASA Planey read parts of Bass's grand jury testimony that stated that Bass never told ASA Planey that he did not actually witness the events recounted in his grand jury testimony, and that Bass was not told what to say before the grand jury. ASA Planey testified that she did not know what the detectives had talked to Bass about before she met

with him.

¶ 22    ASA Planey also testified that she met with Marlon Williams on April 11, 2008, before his grand jury testimony and that Marlon Williams never mentioned anything about a promise from a detective. He told her things that "he'd actually seen." ASA Planey then read parts of Marlon Williams' grand jury testimony, which was substantially similar to the written statement mentioned in ASA Pfieffer's testimony, except that his grand jury testimony did not recount McLaurin's nodding after an unknown third person's statement that McLaurin had "stretched buddy."

¶ 23    The State then called Dr. James Filkins, who testified that he performed an autopsy on the victim's body on January 10, 2008. Dr. Filkins opined that the victim died of multiple gunshot wounds.

¶ 24    The State called Officer Michael Edens (Officer Edens) of the Chicago police department, who testified that he worked in the gang enforcement unit. On January 30, 2008, Officer Edens arrested Marlon Williams after executing a search warrant at his residence and recovering 22 grams of crack cocaine, along with a few scales and baggies for packaging. At the police station, Marlon Williams told Officer Edens that he had information about a homicide that occurred earlier that month near Division and Pulaski, prompting Officer Edens to contact detectives. Officer Edens had no further conversation with Marlon Williams about the homicide. Officer Edens did not promise Marlon Williams anything for information about the homicide and told Marlon Williams that, regardless of what information he gave, the charges against him would stand. Marlon Williams had not asked Officer Edens if he could do anything about his pending charges, and Officer Edens had not known Marlon Williams before the arrest. Officer Edens did not tell Marlon Williams that he would charge him with home invasion if he did not provide information about the shooting.

¶ 25    The State then called police officer Jerry Pentimone (Officer Pentimone), who testified that he is primarily a robbery and burglary officer, but was a narcotics officer on February 13, 2008. He arrested Bass for narcotics on that date. He asked Bass about his knowledge of criminal activity, and Bass told him that he had information about the shooting and a home invasion near the same location. He did not promise Bass any leniency for this information, but Officer Pentimone admitted that Bass might have requested leniency.

¶ 26    Next, the State called Detective Sandoval of the Chicago police department, who testified that he works homicide cases. Detective Sandoval interviewed Marlon Williams on January 30, 2008, with his partner, Carlos Cortez (Detective Cortez). Marlon Williams told the detectives that he witnessed a shooting at Division and Pulaski on January 9, 2008, and did not request any leniency in exchange for the information. Detective Sandoval did not threaten to charge Marlon Williams with home invasion, did not promise him anything in exchange for information, and had no contact with Marlon Williams prior to the January 30, 2008, interview. Detective Sandoval was present when ASA Pfeiffer obtained Marlon Williams' written statement, and observed Marlon Williams sign the statement.

¶ 27    Detective Sandoval further testified that he and Detective Cortez interviewed Bass on February 13, 2008. Detective Sandoval did not promise Bass anything and had no contact

-8-

with Bass prior to the interview. He did not tell Bass what to say to the grand jury and did not tell Bass that he had to be a witness at the grand jury proceedings. Bass gave Detective Sandoval and Detective Cortez information about the shooting, and stated that he witnessed the shooting.

¶ 28    The State's last witness was Detective Cortez. He attempted to interview Jackie Suttle on January 9, 2008, but she was too distraught. He eventually interviewed her on January 17, 2008. Suttle told him that she heard from other people that McLaurin was the shooter. This testimony was used for the limited purpose of impeaching Detective Cortez's testimony that the first time he was provided McLaurin's name during his investigation did not occur until January 30, 2008, when he interviewed Marlon Williams.

¶ 29    Detective Cortez testified that he interviewed Marlon Williams on January 30, 2008, and Marlon Williams told him that the person who shot the victim was named "Kell." Detective Cortez searched a database using that name and found a picture matching the information that Marlon Williams had provided. He showed the photograph to Marlon Williams during the interview, and Marlon Williams identified the person as "Kell," the person who shot the victim. "Kell" is McLaurin's nickname. Detective Cortez testified that he did not have any contact with Marlon Williams prior to the interview, did not promise him anything in exchange for information, and did not promise Marlon Williams that he would make his case disappear if he provided information.

¶ 30    Detective Cortez further testified that he interviewed Bruce Jackson at the police station on April 1, 2008, and that Jackson said he witnessed the shooting, but did not know the name of the shooter. Jackson signed a photographic array advisory form and was shown a group of photographs. Jackson also said that he had never seen the shooter before the shooting on January 9, 2008. Jackson identified McLaurin as the shooter from the photographic array. On July 9, 2008, Detective Cortez arrested McLaurin at a park near Division and Pulaski. On July 10, 2008, Jackson identified McLaurin from an in-person lineup as the shooter.

¶ 31    The State rested its case in the second trial, after the conclusion of Detective Cortez's testimony. The defense case consisted of a stipulation that Suttle had testified at a prior proceeding, where she identified "Reesie" as the "big heavy guy" who was present at the shooting. McLaurin did not testify in his own behalf.

¶ 32    After closing arguments, the parties discussed which exhibits would go to the jury. Defense counsel objected to the jury receiving the complete handwritten statement of Marlon Williams and the transcripts from Marlon Williams' and Bass's grand jury proceedings. The trial court ruled that Marlon Williams' written statement would go to the jury in its entirety so that the jury would be able to determine whether Marlon Williams actually made the statement. The trial court ruled that the grand jury transcripts would be provided only if requested and received by the jurors. After jury deliberations began, the jury requested and received the grand jury transcripts of Marlon Williams' and Bass's testimony.

¶ 33    On June 11, 2010, the jury found McLaurin guilty of first-degree murder and that he personally discharged the firearm that proximately caused the death of the victim.

¶ 34    On July 6, 2010, McLaurin filed a motion for a new trial. At the hearing on his posttrial motion for a new trial, McLaurin requested a new attorney for his posttrial motions and

raised *pro se* claims of ineffective assistance of counsel. The trial court explained that it would hear McLaurin's claims, and if his claims were sufficient, it would appoint other counsel to represent him in a proceeding for ineffective assistance of counsel. The following colloquy then ensued:

"THE DEFENDANT: Well, I feel that Mr. Miraglia didn't properly investigate the case and he stated himself during the proceedings, that he didn't know what anyone would testify to and so forth. You yourself, your Honor, stated that he was ineffective.

THE COURT: When did I say that?

THE DEFENDANT: I can't recall the exact date in which you stated this, your Honor, but you yourself asked him, was you going to report himself [*sic*]?

MIRAGLIA [defense counsel]: There was a date judge, that the State answered ready and I asked for a date because I hadn't subpoenaed a witness and we had a conversation.

THE COURT: All right. I recall that.

* * *

THE COURT: Now, when we were talking about failing to subpoena a witness, who was that witness?

THE DEFENDANT: Timothy Williams

THE COURT: Timothy Williams. And tell me what Mr. Williams would have testified to.

* * *

THE DEFENDANT: He would have testified that he was there, he was with Demarlon Jernigan during the time that Demarlon was shot. He never saw me there and he never saw Bruce Jackson there.

THE COURT: And how do you know that he would have testified to that?

THE DEFENDANT: Mr. Miraglia.

MR. MIRAGLIA: It was in the police reports, and I talked to him and he did inform me that he would come after the case was continued because Mr. Williams was not under subpoena. I was able to locate him out of state. I never served him, but I did talk to him by [tele]phone. He guaranteed me that he would be in court during the trial and he never came.

* * *

THE COURT: All right. Mr. McLaurin, there are two aspects to a charge of ineffective assistance of counsel. The first is whether or not the lawyer's performance fell below an objective standard, not that you didn't like the result but would a reasonably competent lawyer have behaved in a different way such that Mr. Miraglia's conduct fell below that standard. In other words, good lawyers don't do this.

And the second part of ineffective assistance of counsel is that you're prejudiced as a result of that deficient performance.

And so with that view and understanding that lawyers have the ability to make certain choices, they have to have the ability to make certain representations, they have to have

-10-

the ability to set a strategy, that's what they're allowed to do.

\*\*\*

With that in mind let's take those issues. When you say that Mr. Miraglia didn't properly investigate the case because he didn't subpoena this witness, the power of the Court to subpoena a witness is within the Court's jurisdiction, that is the State of Illinois. The State nor no one else can require an out-of-state person to be served with a subpoena, and come in. There may be some mechanism to do that, but if the person is outside of the State of Illinois, they can't be served with a subpoena, and that was the case of Mr. Williams.

Mr. Williams was outside of the state. Your lawyer was in contact with him. He was aware of what Mr. Williams could have testified to and Mr. Williams told him that he would come in. However he didn't come in.

\*\*\*

I don't think that your lawyer failed to investigate your case just because he couldn't get in a witness who wasn't coming in from out of state. He told Mr. Miraglia one thing and it didn't happen. This trial took several days and he didn't come in. You've got to remember this is a retrial. He had an opportunity to come in the first time. He had an opportunity to come in the second time from out of state. He didn't.

\* \* \*

As a result based on everything that I've heard you say, I don't think that we need to go any farther on your *pro se* motion for ineffective assistance of counsel. I'm not going to appoint another lawyer because you haven't made a showing at this point."

¶ 35    Defense counsel then argued his motion for a new trial, emphasizing Marlon Williams' and Bass's lack of credibility. Moreover, defense counsel argued that the State had not laid the proper foundation to admit the entirety of Marlon Williams' and Bass's prior statements into evidence. On September 17, 2010, the trial court denied the motion for a new trial, and after hearing arguments in aggravation and mitigation, sentenced McLaurin to 60 years in the Illinois Department of Corrections. Also on September 17, 2010, McLaurin filed a timely notice of appeal.

¶ 36                                      ANALYSIS

¶ 37    The circuit court of Cook County denied McLaurin's motion for a new trial and sentenced him to 60 years in the Illinois Department of Corrections for first-degree murder and McLaurin filed a timely notice of appeal. Therefore, this court has jurisdiction to consider McLaurin's arguments on appeal pursuant to Illinois Supreme Court Rule 603 (eff. July 1, 1971) and Illinois Supreme Court Rule 606 (eff. Mar. 20, 2009).

¶ 38    On appeal, McLaurin argues that: (1) defense counsel was ineffective because counsel should have secured the testimony of eyewitness Timothy Williams through section 3 of the Witness Attendance Act after Timothy Williams failed to appear at a prior proceeding; (2) defense counsel was ineffective for failing to object to the admission of, and failing to request the redaction of, inadmissable statements in Marlon Williams' prior written

statement and grand jury testimony; (3) the trial court abused its discretion when it allowed the jury to receive a portion of Marlon Williams' prior written statement, because it contained other-crimes evidence that McLaurin allegedly "carries different types of guns"; and (4) the trial court failed to comply with Rule 431(b) because it did not "provide each juror an opportunity to respond" to specific questions regarding McLaurin's presumption of innocence, the burden of proof on the State, and McLaurin's right to not testify in his own defense. McLaurin requests a new trial, or in the alternative, that the case be remanded for the appointment of new counsel to further investigate his posttrial claims of ineffective assistance of counsel.

¶ 39    We first address McLaurin's argument that defense counsel was ineffective for failing to secure the testimony of eyewitness Timothy Williams. Through *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984), and its progeny, the Illinois Supreme Court has provided the trial courts with a clear blueprint for the handling of posttrial *pro se* claims of ineffective assistance of counsel. See also *People v. Moore*, 207 Ill. 2d 68, 77-82, 797 N.E.2d 631, 637-40 (2003) (discussing *Krankel* and its progeny); *People v. Chapman*, 194 Ill. 2d 186, 227-31, 743 N.E.2d 48, 73-75 (2000) (same); *People v. Johnson*, 159 Ill. 2d 97, 124, 636 N.E.2d 485, 497 (1994) (same); *People v. Nitz*, 143 Ill. 2d 82, 133-36, 572 N.E.2d 895, 918-200 (1991) (same). A trial court is not automatically required to appoint new counsel anytime a defendant claims ineffective assistance of counsel. *Moore*, 207 Ill. 2d at 77, 797 N.E.2d at 637. Instead, the trial court must first conduct an inquiry to examine the factual basis underlying a defendant's claim. *Id*. at 77-78, 797 N.E.2d at 637. The inquiry that the trial court conducts has evolved into what is now known as a " '*Krankel* inquiry.' " *People v. Vargas*, 409 Ill. App. 3d 790, 801, 949 N.E.2d 238, 248 (2011).

¶ 40    This court's review of a defendant's claim of error necessarily turns on the *adequacy* of the trial court's inquiry. *Id*. (citing *Moore*, 207 Ill. 2d at 78, 797 N.E.2d at 638). If the trial court determines that the defendant's claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. *Moore*, 207 Ill. 2d at 78, 797 N.E.2d at 637. A claim lacks merit if it is conclusory, misleading, or legally immaterial or does not bring to the trial court's attention a colorable claim of ineffective assistance of counsel. *People v. Burks*, 343 Ill. App. 3d 765, 774, 799 N.E.2d 745, 753 (2003). However, if a defendant's claims "indicate that trial counsel neglected the defendant's case," the trial court must appoint new counsel. *People v. Ramey*, 152 Ill. 2d 41, 52, 604 N.E.2d 275, 280 (1992). During a *Krankel* inquiry, "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." *Moore*, 207 Ill. 2d at 78, 797 N.E.2d at 638. A trial court may base its decision in a *Krankel* inquiry on: (1) the trial counsel's answers and explanations; (2) a "brief discussion between the trial court and the defendant"; or (3) "its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Id*. at 78-79, 797 N.E.2d at 638.

¶ 41    The supreme court has held that if the trial court made no determination on the merits, then our standard of review is *de novo*. *Moore*, 207 Ill. 2d at 75, 797 N.E.2d at 636. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan*

*v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578, 948 N.E.2d 132, 146 (2011). If the trial court has reached a determination on the merits of a defendant's ineffective assistance of counsel claim in a *Krankel* inquiry case, we will reverse only if the trial court's action was manifestly erroneous. *People v. McCarter*, 385 Ill. App. 3d 919, 941, 897 N.E.2d 265, 285 (2008). "Manifest error" is error that which is plain, evident, and indisputable. *People v. Morgan*, 212 Ill. 2d 148, 155, 817 N.E.2d 524, 528 (2004).

¶ 42    On review, even if an appellate court finds that a trial court made an error, it will not reverse if it finds that the error was harmless. *Moore*, 207 Ill. 2d at 80, 797 N.E.2d at 639. However, for the appellate court to be able to conduct a harmless error analysis, there must be enough of a record made concerning the defendant's claims of ineffective assistance for the appellate court to evaluate the trial court's ruling. *Id.* at 81, 797 N.E.2d at 639 (no harmless error analysis was possible because "no record at all was made"). If the trial court conducted no inquiry and made no ruling, the appellate court may need to remand for the limited purpose of allowing the trial court to make an inquiry and ruling. *Id.*, 797 N.E.2d at 639-40 (remanded "for the limited purpose of allowing the trial court to conduct the required preliminary investigation"); *Krankel*, 102 Ill. 2d at 189, 464 N.E.2d at 1049. After the case is remanded and the required inquiry is conducted, "[i]f the court determines that the claim of ineffectiveness is spurious or pertains only to trial strategy, the court may then deny the motion and leave standing the defendant's convictions and sentences. If the trial court denies the motion, defendant may still appeal his assertion of ineffective assistance of counsel along with his other assignments of error." *Moore*, 207 Ill. 2d at 81-82, 797 N.E.2d at 640 (citing *Krankel*, 102 Ill. 2d at 189, 464 N.E.2d at 1049).

¶ 43    In this case, the State claims that there is nothing in the record about defense counsel's efforts to locate eyewitness Timothy Williams for McLaurin's second trial after his failure to locate Timothy Williams before McLaurin's first trial and nothing in the record to prove that Timothy Williams' testimony would have benefitted McLaurin. The State argues that there is not enough of a record to properly evaluate McLaurin's claims of ineffective assistance of counsel, and thus, we should decline to address his claims because it is more appropriate to evaluate such claims in a postconviction proceeding. In support of this argument, the State cites *People v. Phillips*, 383 Ill. App. 3d 521, 544-45, 890 N.E.2d 1058, 1079 (2008), *People v. Millsap*, 374 Ill. App. 3d 857, 863, 873 N.E.2d 396, 402-03 (2007), *People v. Ligon*, 365 Ill. App. 3d 109, 122, 847 N.E.2d 763, 775 (2006), and *People v. Morris*, 229 Ill. App. 3d 144, 166-67, 593 N.E.2d 932, 947-48 (1992). However, none of the cases cited by the State dealt with a *Krankel* inquiry situation in which the defendant presented a *pro se* posttrial motion for ineffective assistance of counsel before the trial court, triggering the trial court's duty to conduct an inquiry based on the defendant's claims.

¶ 44    When the defendant's *pro se* posttrial claims of ineffective assistance of counsel are based on matters outside the record, and the trial court fails to conduct an adequate *Krankel* inquiry, the proper remedy is to remand the matter to the trial court for the limited purpose of allowing the trial court to conduct the required inquiry. *Vargas*, 409 Ill. App. 3d at 803, 949 N.E.2d at 250; *People v. Parsons*, 222 Ill. App. 3d 823, 830-31, 584 N.E.2d 442, 448 (1991); see also *McCarter*, 385 Ill. App. 3d at 942-44, 897 N.E.2d at 285-87; *Moore*, 207 Ill. 2d at 81, 797 N.E.2d at 640. We emphasize that this court is concerned not only with

-13-

whether the trial court conducted an inquiry, but also whether said inquiry was *adequate*. If a trial court conducts an inadequate *Krankel* inquiry, then the inquiry does not meet the purpose of the rule. Considering the entire record before us, the trial court's inquiry in this case was incomplete.

¶ 45    Before McLaurin's first trial, defense counsel sought a continuance because he had been unable to locate Timothy Williams. Defense counsel admitted to the court that he had not subpoenaed Timothy Williams and that he had "no excuse other than schedule and workload." The trial court ordered defense counsel to perform a diligent investigation of his client's case and granted the continuance. The trial court stated that McLaurin "deserves to have a lawyer who will investigate his case" and further found that defense counsel's efforts to locate Timothy Williams were "not due diligence." This suggests that the trial court itself was concerned about defense counsel's performance in the first trial, with respect to this particular witness. Notwithstanding the trial court's comments before the first trial, the trial court denied McLaurin's *pro se* motion for a new trial based on ineffective assistance of counsel after the second trial concluded. The trial court's order denying McLaurin's *pro se* motion for a new trial suggests that the trial court believed that defense counsel's performance was adequate during the second trial. However, the record does not suggest that defense counsel did anything different or made any additional effort to secure Timothy Williams' testimony for the second trial.

¶ 46    We agree with the State's assertion in its brief before this court that there is nothing in the record to indicate that defense counsel attempted to locate Timothy Williams for the second trial. While the State makes this argument in support of a different point, we find that it supports the argument that an adequate *Krankel* inquiry is necessary. While Timothy Williams was never called as a witness at either McLaurin's first or second trial, it is undisputed that at some point defense counsel and McLaurin considered him an important witness. At the posttrial hearing on McLaurin's motion for a new trial after the second trial, in which McLaurin first raised his *pro se* claims of ineffective assistance of counsel, defense counsel did not provide a clear explanation for why he never served Timothy Williams with a subpoena after Timothy Williams failed to return defense counsel's telephone call or come to court. No details were provided and the record does not reflect whether defense counsel conducted an investigation regarding Timothy Williams' testimony, which the trial court instructed him to do prior to McLaurin's first trial.

¶ 47    We observe that the trial court did not inquire into defense counsel's investigation of the potential testimony of Timothy Williams. Instead, the trial court held that he could not have been subpoenaed to testify at trial since he was outside of Illinois at the time of the trial. The trial court stated: "[t]he State nor no one else can require an out of state person to be served with a subpoena, and that was the case of Mr. Williams." The trial court's statement indicates that the trial court was unaware of the Witness Attendance Act. The Witness Attendance Act provides:

> "If a person in any state, which by its laws has made provision [*sic*] for commanding persons within its borders to attend and testify in criminal prosecutions, or grand jury investigations commenced or about to commence, in this state, is a material witness in a prosecution pending in a court in this state, or in a grand jury investigation which has

-14-

commenced or is about to commence, a judge of such court may issue a certificate under the seal of the court stating these facts and specifying the number of days the witness will be required. Said certificate may include a recommendation that the witness be taken into immediate custody and delivered to an officer of this state to assure his attendance in this state. This certificate shall be presented to a judge of a court of record in the county in which the witness is found." 725 ILCS 220/3 (West 2008).

The two key requirements to securing a witness under the Witness Attendance Act are: (1) that the witness is material; and (2) that the state in which the witness resides has made provisions for allowing residents to be subpoenaed by the courts of other states. 725 ILCS 220/3 (West 2008); *People v. Nash*, 36 Ill. 2d 275, 281, 222 N.E.2d 473, 476 (1966) (Act applies only with respect to material witnesses).

¶ 48    Iowa, the state in which Timothy Williams allegedly resided at the time of the second trial, has a law substantially similar to the Illinois Witness Attendance Act. Iowa Code Ann. § 819.1 (West 2012). This law satisfies the second requirement of the Illinois Witness Attendance Act. Thus, the only issue left to determine is whether Timothy Williams is a material witness under the Witness Attendance Act. The moving party bears the burden of establishing the witness's materiality under the Witness Attendance Act. *People v. Burt*, 168 Ill. 2d 49, 71, 658 N.E.2d 375, 386 (1995). Evidence is considered material when it tends to raise a reasonable doubt of the defendant's guilt. *People v. McLaurin*, 184 Ill. 2d 58, 89, 703 N.E.2d 11, 26 (1998). "The pertinent inquiry with respect to materiality is not whether the evidence might have helped the defense but whether it is reasonably likely that the evidence would have affected the outcome of the case." *Id.*

¶ 49    The State argues that the trial court could not have required Timothy Williams to appear at trial under the Witness Attendance Act because he was not a material witness. The State claims that Timothy Williams was not a material witness because there was inadequate information to support McLaurin's belief that Timothy Williams would supply alibi testimony, and the other evidence at trial supports McLaurin's conviction. We do not agree.

¶ 50    Particularly, we note that both defense counsel and McLaurin felt that Timothy Williams was a crucial witness. The trial court accepted the notion that Timothy Williams was a crucial witness and this is evident by a number of the court's actions, including: granting a continuance before the first trial for defense counsel to locate Timothy Williams; criticizing defense counsel for not making an effort to locate Timothy Williams; questioning defense counsel on Timothy Williams' availability during the first trial; and informing the venire of the second trial that Timothy Williams was a potential witness. Furthermore, the first trial ended in a hung jury, and two of the State's eyewitnesses recanted their identifications of McLaurin at the second trial. Also, Jackson's identification testimony was at least partially contradicted by Suttle's testimony that she did not see Jackson at the scene of the crime. Jackson's testimony could have been further contradicted by Timothy Williams' testimony that he also did not see Jackson at the scene of the crime. Moreover, defense counsel believes that Timothy Williams would have testified that he was with the victim at the time of the crime and that he never saw McLaurin there. Defense counsel stated that his knowledge of Timothy Williams' potential testimony came from a police report (not contained in the record), and a conversation with Timothy Williams. Thus, Timothy Williams' testimony

-15-

could have been critical to McLaurin's defense and could have affected the outcome of his case. Therefore, based on all of these facts, the trial court could have found that Timothy Williams was a material witness for purpose of the Witness Attendance Act.

¶ 51        In this case, since the trial court was likely unaware of the Witness Attendance Act, it did not consider the possibility that defense counsel could have secured Timothy Williams as a witness under the Witness Attendance Act. When the trial court addressed McLaurin's *pro se* claims of ineffective assistance of counsel, it stated that there "may be some mechanism" to require an out-of-state witness to appear in Illinois, but the court then concluded that Timothy Williams could not be subpoenaed and could not have been required to testify. This strongly suggests that the trial court did not realize that Timothy Williams may have been available under the Witness Attendance Act. Likewise, it appears that defense counsel was also unaware that he could have secured Timothy Williams as a witness under the Witness Attendance Act.

¶ 52        We acknowledge that in ruling on McLaurin's *pro se* claims of ineffective assistance of counsel, the trial court discussed with defense counsel his efforts in securing Timothy Williams' testimony before the *first* trial. At first glance, it would appear that the trial court conducted an inquiry regarding McLaurin's *pro se* claims of ineffective assistance of counsel. However, the information discussed during the trial court's inquiry was already known to the trial court and was not in dispute. What was in dispute was whether defense counsel made *any* effort to locate Timothy Williams for McLaurin's *second* trial. In fact, the trial court was critical of defense counsel's efforts to locate Timothy Williams for the first trial. Nothing in the record suggests that defense counsel had done anything different for the second trial. Yet, the trial court did not inquire about defense counsel's efforts to locate Timothy Williams for McLaurin's second trial and, the record reveals nothing regarding defense counsel's efforts in that regard. Thus, we are unable to evaluate McLaurin's claims of ineffective assistance of counsel because the trial court's *Krankel* inquiry was incomplete.

¶ 53        We hold that there is not enough in the record to properly evaluate McLaurin's claims of ineffective assistance of counsel. Accordingly, we remand this case to the trial court for the limited purpose of allowing the trial court to make a more complete inquiry into the efforts taken by defense counsel to investigate Timothy Williams as a witness and secure his testimony for the second trial. *Moore*, 207 Ill. 2d at 81, 797 N.E.2d at 640 (remanded "for the limited purpose of allowing the trial court to conduct the required preliminary investigation"); *Krankel*, 102 Ill. 2d at 189, 464 N.E.2d at 1049.

¶ 54        If the trial court denies McLaurin a new trial after a more developed inquiry, nothing precludes the defendant from raising that and otherwise legitimate issues on appeal.

¶ 55        Remanded for the limited purpose of conducting a complete hearing in accordance with *Krankel* and its progeny.


¶ 56        Remanded with directions.