2021 IL App (1st) 180605-U

THIRD DIVISION
March 3, 2021

No. 1-18-0605

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 11 CR 2048 |
| | ) | |
| STEVEN MURPHY, | ) | Honorable |
| | ) | Michelle McDowell Pitman |
| Defendant-Appellant. | ) | Judge Presiding |
| | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

ORDER

¶ 1    *Held*: Affirmed. The circuit court adequately inquired into defendant's *pro se* claims of ineffective assistance of counsel and properly rejected them.

¶ 2    This case is before us for a second time. The first time around, we determined that a letter defendant wrote to the circuit court after trial but before sentencing that listed various gripes with his trial attorney's performance at trial "was sufficient to put the trial court on notice that he was claiming that his trial attorney was ineffective," and thus we remanded the case to the circuit court with instructions to conduct a preliminary inquiry into defendant's *pro se* post-trial claims of ineffective assistance of counsel pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). See *People v. Murphy*, 2017 IL App (1st) 142884-U, ¶¶ 25, 33 (*Murphy I)*. Upon remand, the circuit

court held a preliminary *Krankel* hearing, at which defendant and his trial attorney, Christopher Sneed, testified. At the end of the hearing, the court ruled that defendant's claims of ineffective assistance of counsel lacked merit and denied defendant's *pro* se motion. Defendant appeals that decision, arguing that reversal is warranted because he showed possible neglect of his case. We disagree and affirm.

¶ 3 Defendant was convicted of two counts of aggravated criminal sexual assault stemming from an October 2002 attack on C.W. in Harvey, Illinois. 720 ILCS 5/12-14(a)(3) (West 2002). At trial, C.W. testified that in October 2002, she lived with her four children and brother in-law at 15830 South Loomis Avenue in Harvey, Illinois. On the evening of October 13, 2002, after putting her children to bed, C.W. remembered that she needed to buy milk. C.W. left her house carrying a $5 bill and began walking north on Loomis Street. When she reached 158th Street, C.W. turned east and began walking towards Lexington Avenue. C.W. was wearing jogging pants, a t-shirt, and a buttoned-up shirt jacket. She testified that she walked in the middle of 158th Street because the sidewalks were dark.

¶ 4 As C.W. approached Lexington Avenue, she heard a whistling noise, but she did not observe anyone nearby, so she continued walking. As C.W continued on, she heard the whistling sound again and was then struck in the head and pulled by her hair by a clean-cut African-American man wearing a mask. C.W. testified that the attacker was wielding a shiny gun that made a sound like a marble rolling whenever the attacker moved his hand. C.W. testified that the man said he was going to kill her.

¶ 5 According to C.W., with the gun to her head, the attacker dragged her north on Lexington Avenue to the front of an apartment building. The attacker then forced C.W. to the back of the

apartment building and instructed her to remove her clothing. The attacker then searched C.W. and took the $5 bill she had in her pocket.

¶ 6    Thereafter, the attacker put his penis into C.W.'s mouth and forced her to perform oral sex on him. The attacker then repositioned himself behind C.W. and attempted, unsuccessfully, to anally penetrate C.W. The attacker then inserted his penis into C.W.'s vagina. The attacker then removed his penis and ejaculated on C.W.'s back.

¶ 7    According to C.W., the attacker then told C.W. to get dressed and then pulled her by her hair down the alley. The man eventually stopped near a garage, where he told C.W. to put her face on the ground. The man told C.W. that he would kill her if she lifted her head and instructed her to count to ten. When C.W. reached four or five, she heard feet running and saw from the corner of her eye a figure leaving the area. C.W. stood up and ran home.

¶ 8    When she got home, C.W. left her clothes in the bathroom and took a shower. She also called her children's father, Lawrence Davis. Although she did not tell Davis what happened, she was hysterical. The following morning, Davis came to C.W.'s residence, and she called the police.

¶ 9    On October 15, 2002, at 1 a.m., Harvey police officer Keyes came to C.W.'s home and took a report. On October 16, 2002, a detective from the Harvey Police Department came to C.W.'s home and recovered the clothing C.W. was wearing when she was attacked. According to C.W., from that point until December 2010, she did not hear from anyone regarding the case.

¶ 10    On December 9, 2010, C.W. was visited by Joe Thomas, an investigator with the Cook County State's Attorney's Office, regarding her case.

¶ 11    Davis testified that sometime early on October 14, 2002, he received a phone call from C.W., during which C.W. was very upset. The following morning, Davis went to C.W.'s home and saw that she was crying. Davis stayed with C.W. until police arrived.

¶ 12    The parties stipulated that on October 16, 2002, a detective from the Harvey Police Department recovered a red t-shirt, black sweatpants, and a red plaid sweatshirt from C.W. The detective inventoried the clothing and then sent it to the Illinois State Police Joliet Forensic Science Laboratory.

¶ 13    Kelly Krajnik testified that in 2003, she was employed by the Illinois State Police as a forensic scientist specializing in biology and DNA analysis. Krajnik testified that she analyzed the clothing recovered from C.W. She testified that four stains on C.W.'s red t-shirt tested positive for semen, and she located another semen stain on C.W.'s black sweatpants. In addition, Krajnik noted that hair samples were collected from the sweatpants and t-shirt.

¶ 14    The parties then stipulated that in April 2003, Leslie Rosier, a DNA analyst at Orchid Cellmark Laboratory, performed a DNA analysis on cuttings from the red t-shirt. The analysis produced a human male DNA profile that was suitable for comparison purposes.

¶ 15    Lyle Boicken testified that he worked as a forensic scientist in the field of forensic biology and forensic DNA analysis for the Illinois State Police Crime lab. According to Boicken, on April 28, 2003, the DNA profile obtained by Rosier from the red t-shirt cuttings was entered into a computer database. On June 2, 2008, a notification was returned alerting Boicken of a match between the profile and defendant. Boicken then generated a report and requested a buccal standard from defendant.

¶ 16    Thomas testified that on December 9 and 16, 2010, he met with C.W. to discuss the October 2002 assault. On January 13, 2011, Thomas arrested defendant. Thomas *Mirandized*

defendant, who signed a waiver and sat for an interview with Thomas. According to Thomas, after showing defendant a picture of C.W., defendant denied knowing her and stated that he would "never touch anything like that." Defendant told Thomas that in 2002, he lived at 15731 South Lexington Avenue in Harvey—the same location where C.W. was assaulted. During the interview, defendant consented to and provided a buccal swab.

¶ 17    On January 14, 2011, the Illinois State Police Crime Lab received defendant's buccal swab and used it to generate a DNA profile of defendant. Using that sample, Boicken opined that DNA found on C.W.'s red t-shirt matched defendant's DNA. Boicken explained that the DNA profile would be expected to occur in approximately one in 770 quadrillion black, one in 960 quadrillion Hispanic, or one in 3.1 quintillion White, unrelated individuals.

¶ 18    Defendant did not present any witnesses and did not testify. A jury found him guilty of two counts of aggravated criminal sexual assault.

¶ 19    Afterwards, defendant's trial attorney filed a motion for new trial. Before the hearing in that motion, defendant wrote a letter to the circuit court stating

> "I'm not sure if my Public Defender Mr. Sneed, will hit all the key points of all the grounds needed for the retrial, because they were his mistakes and one might not see his own mistakes. But the lack of evidence and witnesses on my behalf was not presented in my case. I have giving [sic] the Public Defender the correct information on how to get in contact with one of my witnesses and he made no attempt to contact my witness, cause [sic] my witness was in contact with me for a while. Now I don't know how to get in contact with the witness myself, but I could lead my Public Defender in the right direction to locate the witnesses. Plus the Public Defender would not ask any of the question [sic] that I had for the victim or the young lady that was a lab tech. Because I

have great questions to ask. And the one thing that bother [*sic*] me is the fact that in the police report the victim said she could not identify her assailer, but could tell he was nicely shaved under a mask. And that was said on the stand under oath.

\*\*\*

And one more thing before I end this letter. If you could, ask Mr. Sneed my Public Defender if he could put more effort in coming to see me. Out of the three and a half years that I have been fighting this case. He has only come to see me once. And I tryed [*sic*] to get my papers to go over a plan of action, but he ack [*sic*] like he didn't have time."

¶ 20　When the court held the hearing on defendant's motion for new trial, it questioned defendant about the letter, asking him, among other things, whether he still wanted Sneed to represent him and proceed on the motion for new trial. After allowing defendant to confer with Sneed, defendant answered yes to those questions. Sneed then argued defendant's motion for new trial. The court ultimately denied the motion and sentenced defendant to 20 years' imprisonment on each count, to be served consecutively.

¶ 21　In his first appeal, defendant argued that the circuit court failed to conduct a proper preliminary *Krankel* inquiry in the claims of ineffective assistance of counsel raised by defendant in his letter to the court. We agreed and remanded the case to circuit court with instructions to conduct a preliminary *Krankel* inquiry into defendant's *pro se* allegations of ineffective assistance of counsel. *Murphy I*, 2017 IL App (1st) 142884-U, ¶ 33.

¶ 22　On February 23, 2018, the circuit court held a preliminary *Krankel* hearing pursuant to our mandate. Initially, we note that although defendant purported to raise ten claims of ineffective assistance of counsel, on appeal he only pursues two of those arguments—that Sneed

was ineffective for failing to (1) present evidence, in the form of police or medical reports, showing that C.W. did not have any physical injuries; and (2) pursue a consent defense. Thus, our recitation of what transpired at the *Krankel* hearing will be limited to discussions pertaining to those issues.

¶ 23    At the hearing, defendant first suggested that Sneed was ineffective for failing to consult with him before agreeing to stipulate to testimony from Officer Keyes. Defendant maintained that, had Sneed consulted him regarding the stipulation, he would have asked Sneed to question Officer Keyes about his observations of C.W.'s "physical state when he first seen her." Elaborating, defendant noted that Officer Keyes was "the first officer on the scene" and C.W. had "alleged that she got hit in the head with a gun," so he would have liked to "have asked her what was her condition; things like that."

¶ 24    Defendant then discussed Sneed's failure to introduce evidence of C.W.'s physical condition from medical reports. He explained that he "figured [Sneed] could have *** called onto the medical examiner that did the actual medical report on the victim. If they couldn't get Mr. Keyes to come in and say on her first physical appearance, you know, maybe the medical examiner could have also spoke on the matter." That led to the following colloquy between defendant and the court:

"THE COURT: So what is it you are saying he didn't do? The medical examiner. You're saying a doctor, sir?

THE DEFENDANT: Yes.

THE COURT: So what was missing with the doctor's evidence?

THE DEFENDANT: The person who took the initial medical report on the victim, he could have called in the medical examiner to put on the stand to be cross examined.

THE COURT: Do you know what that person was going to say?

THE DEFENDANT: I don't have the medical – I never got a hold of the medical report.

THE COURT: So you don't know what they were going to say if it was favorable to you or not?

THE DEFENDANT: Well, it was told to me by Mr. Sneed was that it was no signs of abrasions, torn tissues, or bruises on the victim. So that's why I bring this issue up from hearsay. That's all I know from what he told me."

¶ 25    With respect to Sneed's failure to present a consent defense, defendant stated that Sneed informed him that that defense was problematic because defendant could be easily impeached with his prior statements to the police denying that he knew C.W. He explained:

"Not once did I ever deny having contact with her, but, you know, it's more or less where—

* * *

*** It was more or less at the time when they was interviewing me, I didn't know who the person was. They showed me a more recent picture of her than, you know, than the picture from the incident, the date of the incident. So it was a slight difference. I couldn't tell who it was, plus the time lapse. Years that went by. I had no idea who the person was. But during the time I actually started remembering and figuring out. But I was told it's too late to change my defense, whatever you want to call that."

The following colloquy then occurred between defendant and the court:

"THE COURT: You were told it's too late to change your defense.

THE DEFENDANT: Yes. He told me I couldn't change up. He said I had to go with what I started in the beginning.

THE COURT: Which was?

THE DEFENDANT: That I had no recollection of the victim."

¶ 26    The court then propounded questions to Sneed. The court began with the allegation that Sneed failed to introduce police and medical reports that would have allegedly documented C.W.'s lack of physical injuries following the assault. When asked by the court whether he was "aware what the Defendant is speaking of[,]" Sneed stated, "[t]o be honest, Judge, no I am not aware. Police reports of course were reviewed. Medical records, of course, were reviewed, presented to the defense that I thought was appropriate."

¶ 27    Later, the court questioned Sneed about the medical reports:

"THE COURT: With regard to the person who took the medical report from the victim showing no abrasions, were you aware of the medical report? Did you review it?

MR. SNEED: I am absolutely sure I reviewed the medical reports in the sexual assault case. That would be one of the many pages of those medical reports. That would be the thing we would be looking for.

THE COURT: Did you go over that? Defendant is indicating you didn't go over that with him.

MR. SNEED: I don't have any recollection that I did or did not go over with him. I just don't know. That would be something I would have said hey,

you know what, there are no abrasions here, bruises. There is no indication of physical indication of any assault occurring here.

> THE COURT: So would that have been something you told your client?

> MR. SNEED: I am sure that's the reason why he knows it. Because I told him."

¶ 28 Finally, the court asked Sneed about his decision to forgo pursuing a consent defense. When asked whether he discussed trial strategy with defendant, Sneed stated

> "I am sure that I did. And I am sure I weighed whether or not it was appropriate—

> * * *

> *** Whether or not the best course would be to now change to get on the stand he would have to do. To get on the stand and say yes I knew this woman. I had consensual sexual contact with her. Or to go with somehow his D.N.A. got on her clothes. The Court recalls—I don't know if you recall, but the D.N.A. was found on a clothing item that was taken from the trash; if my recollection is correct in this case. He was then—When there was a cold case hit with his D.N.A., they then went down to the jail and interviewed him and asked him several questions regarding his knowledge of this woman and his thing that he might do. Not just whether or not he knew her, but other questions that they asked as well, which kind of boxed him out—His answers boxed him out of most defenses, including that he had consensual sex with her. Because what he is speaking of is that he told the police that he did not know this woman. He had not seen this woman. Did not know who she was.

Then that story changed to oh yes, I do know this woman. Okay. So now I am left with the idea of having to put a defendant on the stand who is going to contradict from my standpoint appeared to be a liar, or to just attack how the D.N.A. got there. That to me seems to be a matter of strategy as to how to proceed. If that was wrong, that was wrong. Okay. Did we have a conversation about it? I am sure that we had a conversation about it. Was it my decision? It was absolutely my decision."

¶ 29    At the conclusion of the hearing, the court denied defendant's motion, finding that his claims of ineffective assistance of counsel "lack merit."

¶ 30    On appeal, defendant argues that his case should be remanded for further proceedings because he established possible neglect of his case. "A *pro se* posttrial motion alleging ineffective assistance of counsel is governed by the common-law procedure developed" by our supreme court in *People v. Krankel*, 102 Ill. 2d 181 (1984), and "refined by its progeny." *People v. Roddis*, 2020 IL 124352, ¶ 34.

¶ 31    Under *Krankel*, "[n]ew counsel is not automatically appointed in every case when a defendant presents a *pro se* posttrial motion alleging ineffective assistance of counsel." *Id.* ¶ 35. Instead, "when a defendant makes such a claim, the court should first examine the factual basis of the defendant's claim." If, from that examination, "the court determines that the claim lacks merit or pertains only to matters of trial strategy," then the court may deny the *pro se* motion without appointing new counsel. *Id.*; see also *id.* ¶ 70 ("[A] trial court may consider both the facts and legal merits of a defendant's *pro se* posttrial allegations of ineffective assistance of counsel at the preliminary inquiry stage."). If, however, "the allegations show possible neglect of the case, new counsel should be appointed. *Id.* ¶ 35.

¶ 32    We begin by again noting that, although defendant raised ten allegations of ineffective assistance of counsel, on appeal he has only pursued his claims that Sneed was ineffective for failing to (1) present evidence from police and medical reports about C.W.'s physical condition and (2) pursue a consent defense. Any allegations of ineffective assistance that defendant raised in the court below but not on appeal are forfeited. *People v. Enis*, 194 Ill. 2d 361, 376 (2000).

¶ 33    At this stage, our "operative concern *** is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *People v. Moore*, 207 Ill. 2d 68, 78 (2003). There is no fixed constellation for making that determination. Sometimes, "[a] brief discussion between the trial court and the defendant" will be "sufficient." *People v. Moore*, 207 Ill. 2d 68, 77 (2003). Sometimes, the circuit court will be able to assess the defendant's claims based on its "knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Id*. Other times, the court may need to question trial counsel "regarding the facts and circumstances surrounding the allegedly ineffective representation" to assess the defendant's claims and determine "what further action, if any, is warranted." *Id*.

¶ 34    Whether the trial court properly conducted a preliminary *Krankel* inquiry presents a legal question that we review *de novo*. *Roddis*, 2020 IL 124352, ¶ 33. However, when the court has conducted a proper inquiry and rejected the defendant's *pro se* claims on the merits, "we will reverse only if the trial court's action was manifestly erroneous." *People v. McLaurin*, 2012 IL App (1st) 102943, ¶ 41. An error is "manifest" when it is plain, evident, or indisputable." *Id*.

¶ 35    "To show that counsel was ineffective, defendant must show that a deficiency in counsel's performance prejudiced his defense." *People v. Edmondson*, 2018 IL App (1st) 151381, ¶ 33 (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984) and *People v. Albanese*,

104 Ill. 2d 504, 526-27 (1984)). And "to be deficient," we have explained, "counsel's representation must be objectively unreasonable under prevailing professional norms." *Id*. To make that showing, the defendant "must overcome a 'strong presumption' that counsel's alleged error was part of a 'sound trial strategy.' " *Id.* (quoting *People v. Houston*, 226 Ill. 2d 135, 144 (2007)).

¶ 36    Here, the circuit court correctly denied defendant's claim that Sneed was ineffective for failing to (1) put on evidence from police and medical reports about C.W.'s physical condition following the assault and (2) pursue a consent defense, because both of those decisions related to matters of trial strategy and were thus immune from attack under *Strickland* and its progeny. See *People v. Custer*, 2019 IL 123339, ¶ 39 (internal quotations and citations omitted) (explaining that "matters of trial strategy are generally immune from claims of ineffective assistance of counsel" and may only be attacked under the rubric of ineffective assistance of counsel where trial counsel "entirely fails to conduct any meaningful adversarial testing").

¶ 37    First, Sneed's decision to forgo pursuing a consent defense plainly related to a matter of trial strategy, and thus is not subject to challenge under the Sixth Amendment unless it was so obviously incorrect or misguided as to amount to no trial strategy at all. See *id*. That is not the case here. Defendant denied knowing C.W., even after he was shown her picture, and still then even after he was told his DNA was found on her clothing. As Sneed explained at the *Krankel* hearing, to pursue a consent defense, defendant almost certainly would have had to testify that his DNA came to be present on C.W.'s clothing as a result of a voluntary sexual encounter, and in doing so would have opened himself up to potentially crippling impeachment based on his prior statements denying ever knowing C.W. when shown her picture.

¶ 38 Yes, defendant could have said, as he did in his *Krankel* allegations, that the passage of time and the inevitable changes in C.W.'s appearance explained his failure to recognize her photograph. But that just makes counsel's tactical decision debatable. It does not overcome the presumption that Sneed's judgment to forgo a consent defense, based as it was on the facts of the case—including defendant's own statements to the police—was reasonable trial strategy and thus immune from attack under *Strickland*.

¶ 39 Simply put, had defense counsel argued consent to the jury—had he argued, that is, that he and C.W. were acquainted and engaged in consensual intercourse—the defense would have had to overcome two rather significant barriers. One, as just noted, the defense would have to explain why defendant had originally denied knowing C.W. and said he would "never touch anything like that." And two, the defense would have to accuse C.W. of completely fabricating her story of going out late at night to get some milk, being dragged to a hidden location and assaulted, and calling her children's father in hysterics later that night (the latter of which he corroborated). Instead, so the theory would go, C.W. decided that she would report a consensual sexual encounter with a man as a sexual assault, but not identify the man by name or in any meaningful way.

¶ 40 Suffice it to say, it was not an unreasonable trial strategy to chart a different course.

¶ 41 Likewise, defendant's claim that Sneed should have introduced evidence from police and medical reports that would have documented an absence of physical injuries to C.W. fails because it is based on pure speculation. Without supporting evidence, defendant maintains that it was "very likely" that the attack C.W. described to the jury would have produced observable physical injuries. But C.W. testified that defendant pulled her hair, not that he pulled some of it out, so we cannot agree that it was "very likely" that the hair pulling would have left a mark on

C.W. In the same vein, C.W. testified she was struck on her head, which was obscured by hair, not her face, so we also cannot agree with defendant's suggestion that that aspect of the attack would have resulted in a visible physical injury. And finally, defendant's claim that C.W.'s knees should have shown injuries based on her testimony that defendant forced C.W. to her knees is premised on testimony C.W. never gave: C.W. testified that her pants were down, but she never said her pants were down below her knee such that the skin of her knees touched the ground.

¶ 42    To the extent that defendant suggests that Sneed should have sought to introduce evidence showing that C.W. was not physically injured to support a hypothetical consent defense, defendant cannot show that he was prejudiced, because the evidence would not have made a difference at trial. For one thing, as noted previously, the consent defense would have encountered some problems of its own. And the absence of physical injuries did not necessarily carry the promise defendant suggests. C.W. testified at length regarding her interactions with defendant and provided a blow-by-blow account of his attack upon her. The detailed nature of her testimony, coupled with her outcry to Davis shortly after the attack, would not have been seriously altered by the lack of visible physical injury, which could be easily explained away. And we are long past the outdated notion that physical force, sufficient to produce marks or wounds, is necessary to show that a victim did not consent to a sexual encounter.

¶ 43    The trial court conducted an adequate preliminary *Krankel* hearing, and we have no basis for finding its conclusions manifestly erroneous. We thus affirm the judgment of the trial court.

¶ 44    Affirmed.