2021 IL App (2d) 190993-U
No. 2-19-0993
Order filed December 3, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-CF-1802 |
| | ) | |
| CHRISTOPHER J. TURECEK, | ) ) | Honorable Kathryn D. Karayannis, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices McLaren and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Defendant forfeited his argument that a hearsay exception applied to certain testimony; he also failed to show ineffective assistance of defense counsel in failing to contemporaneously raise the hearsay objection, where there was no prejudice as a result of counsel's inaction; there was not sufficient evidence to warrant a necessity-defense instruction.  (2) The court failed to conduct a proper preliminary *Krankel* inquiry as to one of defendant's ineffective-assistance claims, specifically, concerning lesser-included-offense instructions.  The cause is remanded for the court to conduct a proper preliminary inquiry.  Affirmed in part, reversed in part, and remanded with directions.

¶ 2    After a jury trial, defendant, Christopher J. Turecek, was convicted of aggravated battery

(720 ILCS 5/12-3.05(a)(5) (West 2020)) and home invasion (720 ILCS 5/19-6(a)(2) (West 2020))

and sentenced to concurrent terms of 3 years' and 7½ years' imprisonment. The trial court denied defendant's motion to reconsider sentence. He appeals, arguing that the trial court (1) erred in sustaining certain hearsay objections and that there was sufficient evidence to warrant a necessity-defense instruction; and (2) failed in several respects to conduct an adequate preliminary (*i.e.*, first-stage) examination, consistent with the procedure in *People v. Krankel*, 102 Ill. 2d 181, 189 (1984), into his posttrial *pro se* ineffective-assistance-of-trial-counsel claims. We affirm as to the first issue, but conclude that one of defendant's *Krankel* arguments—specifically, concerning defense counsel's failure to proffer lesser-included-offense instructions—is potentially meritorious and, accordingly, we reverse and remand for a proper preliminary *Krankel* inquiry.

¶ 3                                I. BACKGROUND

¶ 4     The State alleged that, on September 3, 2018, defendant committed home invasion by knowingly and without authority entering 1331 Brandywine Circle in Batavia, where he intentionally caused injury to Erick Rodriguez. It also alleged that, when he knowingly strangled Rodriguez, defendant committed aggravated battery.

¶ 5     The defense gave notice that it was going to rely on the necessity affirmative defense. 720 ILCS 5/7-13 (West 2020).

¶ 6                                   A. Trial

¶ 7     Trial commenced on July 15, 2019. The State's theory of the case was that defendant forced his way into Rodriguez's home and attacked Rodriguez and his brother, Scott. Rodriguez had recently started dating Kyra Trynoski, who was also defendant's ex-girlfriend. Trynoski was at Rodriguez's home on the day of the incident, and defendant acted out of jealousy. According to the State, defendant twice went to Rodriguez's home on September 3, 2018. First, in the early morning hours, he knocked on the door, Trynoski answered, and defendant entered without being

invited. At this point, only Rodriguez and Trynoski were in the residence. Trynoski yelled at defendant, and he left. Rodriguez called Scott and asked him to come to the residence.

¶ 8    After Scott arrived, the occupants heard banging and kicking at the side door. Defendant was there (*i.e.*, the second visit) with another individual, whom Rodriguez and Scott did not know. They forced their way into the residence and began fighting with Rodriguez and Scott. Defendant, the State argued the evidence would show, acted out of jealousy and put Rodriguez in a chokehold and tried to strangle him. Once police arrived, the other individual left the scene. Rodriguez and Scott held defendant until police entered the residence. At this point, Trynoski had left.

¶ 9    The defense's position was that, when defendant first went to Rodriguez's home, Trynoski let him in, the two talked, and then defendant left. After defendant had not heard from Trynoski for some time, he returned to the residence a second time. He saw that Trynoski was asleep on the living room couch and tapped on the window. Trynoski awoke and let him in, and they talked. Rodriguez and Scott then attacked defendant.

¶ 10                          1. *The State's Case-in-Chief*

¶ 11                          a. Erick Rodriguez

¶ 12    Rodriguez, age 25 at trial, testified that, on September 3, 2018, he lived in a house at 1331 Brandywine Circle in Batavia. Rodriguez was dating Trynoski at this time, and she had moved in the prior month. However, that day, Trynoski was moving out. (Rodriguez had two roommates, but they were not there that day.)

¶ 13    Addressing defendant's first visit to his house, Rodriguez testified that, between 1 and 2 a.m., he heard a loud knock on the front door. Trynoski opened the door. Rodriguez, who was behind her, saw defendant, who walked inside the home. Rodriguez did not invite defendant in, and he did not hear Trynoski say anything. According to Rodriguez, defendant approached him.

Rodriguez walked away, but defendant grabbed his arm, pushed him toward the laundry room, and brought Rodriguez to the floor. Defendant then strangled him. Rodriguez struggled to breathe and started to lose consciousness. Rodriguez testified that, prior to this, he did not hit or yell at defendant. Trynoski was still there, telling defendant to go away. Another person was behind defendant, yelling, "Please don't call the police. We don't mean any harm."

¶ 14　Rodriguez further testified that defendant stated they had the house surrounded and could kill him in less than five seconds. At some point, defendant released Rodriguez and left with the other individual. Rodriguez locked the doors. Trynoski told Rodriguez not to call the police because defendant had a family. Rodriguez called his brother, Scott, and his mother. Scott came to the house.

¶ 15　Addressing defendant's second visit, Rodriguez testified that he noticed a car driving around the neighborhood, which was unusual. He and Scott turned off the lights in the house. After a while, Rodriguez heard tapping on the windows and saw two figures outside his house. The people went to the side door, which accesses the kitchen. Scott went to the door, and Rodriguez broke into his roommate Justin's locked room to look for a weapon. There, he retrieved a crossbow that hung on the wall. (There was no arrow in it.) He joined Scott by the side door. Scott held the door with his shoulder, trying to keep it closed. The individuals outside banged on and kicked in the door. Defendant and another individual forced their way inside.

¶ 16　Rodriguez testified that, during defendant's second visit, he did not invite defendant into his home, nor did he hear Scott or Trynoski invite him in. Defendant and the other individual first attacked Scott and brought him to the floor. At this point, Rodriguez had dropped the bow. Rodriguez tried to get defendant off of Scott, but the other individual held back Rodriguez and then defendant approached Rodriguez and started choking him. Defendant stated that he was going

to steal everything that Rodriguez owned. Rodriguez began to lose consciousness and could not breathe. He screamed at one point.

¶ 17    Rodriguez saw emergency lights outside. The individual who came with defendant left via the side door. Rodriguez was on the floor with defendant, and defendant "put his hands and made it look like I was strangling him or holding him." Scott assisted in holding defendant. Rodriguez told defendant, "You're not going anywhere."

¶ 18    The police entered the house, and defendant stated, "These two Mexicans [b]roke into my house, and they stole—they have my girlfriend," and, "These crackheads." At this point, Trynoski had left.

¶ 19    Rodriguez sustained a black eye and bruising over his body, including his shoulder. A photograph depicted dents in the side door that were not there before the incident.

¶ 20    On cross-examination, Rodriguez testified that he hung out with Trynoski for four months before September 3, 2018. They used to work together. He did not learn from her that she hung out with defendant while she dated Rodriguez, nor did he learn that they went on vacation together a few days before September 3, 2018.

¶ 21    Rodriguez spoke with prosecutors on July 3, 2019. He did not tell them that defendant said, "Give me everything." He also did not tell them that someone put an arm around his neck and that he was about to lose consciousness. Rodriguez told the prosecutors that he did not call the police because he had marijuana in the house.

¶ 22    In his written statement to police, Rodriguez did not mention the first time that defendant came into the house and allegedly strangled him, but he claimed that he did tell the officers about the first incident. He also told them that defendant placed his arm around his neck and brought him toward the laundry room.

¶ 23                          b. Scott Rodriguez

¶ 24    Scott testified that, in the early morning hours of September 3, 2018, he received a call from his mother and went to Rodriguez's house. He entered the house via the side door and did not notice any damage to the door. Rodgriguez was frightened and anxious. The lights were off in the house.

¶ 25    Addressing defendant's second visit, Scott heard tapping on the window in the front of the house, rustling in the bushes, and knocking on the side door that became progressively louder and more violent. Scott walked toward the door and yelled for "them" to stop and warned that he would call the police. The knocking and banging continued. The door started to crack open. Scott was dialing 911 at this time. Rodriguez tried to hold the door shut, and Scott dropped his phone to assist him, but two men entered. He had not seen either of them before.

¶ 26    Scott started to fight with one of the men, who wore a White Sox hat and choked him. He could see that Rodriguez was being choked as well. They fought for 5 to 10 minutes. Scott could not breathe. Rodriguez came to help Scott, and Scott was able to get away from the person wrestling with him.

¶ 27    At some point, Scott saw police lights, and the person with whom he had been fighting ran out the door. Scott and Rodriguez held down the other individual until the police entered the house. An exhibit of a screenshot of his call logs showed that Scott made an emergency call at 4 a.m. on September 3, 2018.

¶ 28                          c. Officer Christopher Schultz

¶ 29    Batavia police officer Christopher Schultz testified that he responded to the scene and heard people yelling as he approached the side door of the house, which was open. Schultz observed three people inside, two of which were restraining defendant, who was on his stomach. They were

not striking or kicking defendant or attacking him in any way. Officer Schultz placed defendant in handcuffs and took him to his patrol car. He observed a small laceration and bump under defendant's right eye.

¶ 30                                        d. Kyra Trynoski

¶ 31     Kyra Trynoski, age 22, testified that she dated defendant for two years, beginning in 2016 and ending about May 2018. Afterward, she had a "fling" with Rodriguez and, in August 2018, began living with him and moved some of her belongings into his garage at 1331 Brandywine Circle.

¶ 32     By September 2, 2018, Trynoski had moved out most of her belongings from Rodriguez's home. Rodriguez was upset that she was moving out of his home. That day, defendant invited Trynoski to a bonfire at his place. She was undecided if she would go.

¶ 33     Addressing defendant's first visit, Trynoski testified that, after midnight, she went to Rodriguez's house to inventory the last of her belongings and to pack. Only she and Rodriguez were in the house. Around 1 a.m., Trynoski heard banging on the front door. She opened the door and saw defendant, who appeared stressed, worried, and angered. He was also very upset with Trynoski. Defendant was not enraged, but Trynoski admitted to previously telling a Batavia police officer that defendant was enraged. Defendant's voice was raised, but she previously told officers that he was yelling.

¶ 34     Trynoski did not invite defendant inside, but he entered the house when he saw Rodriguez approach. "So he came through the door as I was trying to close it." She was trying to keep defendant out of the house. "I was telling him that I would talk to him later and I would handle the situation, because I was trying to get my stuff out and go home."

¶ 35    Trynoski fell down when she tried to close the door. When she turned, she saw defendant and Rodriguez fighting on the floor. Another man had followed defendant into the house, but she did not know the person. She told them to stop fighting, and defendant yelled at her. He was very angry. After defendant stopped, Rodriguez told him to leave. Defendant and the other man did so.

¶ 36    After they left, Trynoski and Rodriguez locked all the doors. She told Rodriguez not to call the police because it would make things worse and because she believed they would not return.

¶ 37    After Rodriguez called his mother, Scott came to the house. He parked behind Trysnoski's car, and she was unable to leave. Trynoski told Rodriguez and Scott that she wanted to leave, but Scott did not move his car. They did not want her to leave, but they did not force her to stay.

¶ 38    Addressing defendant's second visit to Rodriguez's home, Trynoski testified that she heard voices and banging by the side door. "I heard them yelling inside for me." Trynoski also heard banging on the windows. She was on the phone with her mother, who told her it was a dangerous situation and that Trynoski should get herself out. Trynoski saw Rodriguez and Scott go to the side door. She walked to the front door, unlocked it, but went to the back room to retrieve her purse. Trynoski retrieved her purse and shoes and picked up Scott's phone on the hallway floor where the men were fighting because she saw it light up with "911" and ring. She picked it up to speak to the police, but it got disconnected. Trynoski did not call back the police. She also took Rodriguez's phone. Trynoski then ran out the door (the door had been opened while she was retrieving her purse; she believed that defendant came in that door) because her mother wanted her to get away.

¶ 39    Trynoski believed that someone had broken in the side door because she heard it open and crash against the cabinet behind it. She heard Rodriguez and Scott yelling at the people outside

not to come in. She did not see who came in the house because it was dark. "I just ran." As Trynoski was walking down the street, her mother arrived to pick her up. She also saw the police coming. She did not stop. After she arrived home, the police called her.

¶ 40    On September 4, 2018, Trynoski gave a recorded statement to police, stating that she believed Rodriguez and Scott were holding the door because the others were trying to kick it in. She testified that she did not actually see what they were doing with the door.

¶ 41    On September 5, 2018, Trynoski spoke to defendant on the telephone, and the calls were recorded and played for the jury. In the first call, defendant stated, "you're my witness and you need to stay away from them," and, "You could actually do witness intimidation toward them, or vice versa." He instructed Trynoski to "block their numbers." In the second call, defendant stated that Trynoski had to tell the police that Rodriguez and Scott were holding her against her will and that he came there to get her out. Trynoski responded that she could not tell them that because they saw that the door was broken. Trynoski stated she could not change what she said because she had already given a statement and told the police the truth. Defendant told her that she needed to testify that she asked him to come get her because they would not let her leave and blocked her car. Defendant also told Trynoski that she had to come clean and tell the truth that he came to get her out because she asked him to and they would not let her leave. He also stated that this was his only defense and that he told this to police. Defendant stated that Trynoski had to say that she called him. She responded that she did not call or text him.

¶ 42    Trynoski testified that, after the incident, she still had feelings for defendant and loved him. She no longer speaks to Rodriguez.

¶ 43    On cross-examination, Trynoski stated that, while she was moving out, Rodriguez was agitated and emotionally unstable. During her "fling" with Rodriguez, she was still in contact with

defendant, because his second cousin worked for her mother and he needed transportation to and from work. Trynoski and defendant exchanged phone calls and text messages. They also spent a weekend camping together a few days before the incident. They "wanted to rekindle [their] friendship." In a January 24, 2019, affidavit, Trynoski did not state that defendant barged in when he came to the house the first time. She testified that defendant came in to help diffuse the situation with Rodriguez because defendant knew that Rodriguez was upset that she was moving out of the house.

¶ 44    When asked if she told Scott that she wanted to leave, she replied that she did, "but we were all stuck there." Scott did not move his car, and she did not ask him to move it; she believed it was implied. She told Rodriguez that she wanted to leave.

¶ 45    During the second incident, Trynoski heard defendant's voice outside the front of the house, not outside the side door. He was upset. She knew that there was marijuana in Rodriguez's house.

¶ 46                                e. Officer Paul Burdett

¶ 47    Batavia police officer Paul Burdett testified that he arrived at the scene after Office Schultz. After defendant was handcuffed, he conducted a sweep of the home. He looked for Trynoski and another male (described as a white male, 5 feet 8 inches tall, with dark blond hair, a long beard, and wearing a White Sox hat), but did not find either person.

¶ 48    On cross-examination, he testified that he saw a pocketknife on the floor in the kitchen, a scale with suspected cannabis residue on it, and a nugget of suspected cannabis on the kitchen counter. He also saw drug paraphernalia in the living room.

¶ 49                                f. Officer Chris Potthoff

¶ 50    Batavia police officer Chris Potthoff responded to the scene after Officer Schultz and followed him in, about 30 to 50 feet behind.  Potthoff entered the side door and saw two men holding down defendant, who was face down.  One of the men, later identified as Rodriguez, stated that defendant was one of the men who broke in.  He observed that the door was dented and pieces of it were on the door mat.  Officer Potthoff also observed a smear of fresh mud on the door.  He observed injuries on Rodriguez, including cuts and bruises on his face, shoulder, and arm.  He also observed injuries to defendant's face.

¶ 51                              g. Detective Matthew Miller

¶ 52    Batavia police detective Matthew Miller was at Rodriguez's home at 10:40 a.m. on September 3, 2018.  In the kitchen, he saw a White Sox baseball cap.  He also observed a scale with suspected cannabis residue on it and a small amount of cannabis.  In the living room, he saw a cannabis grinder with suspected cannabis residue inside of it and two pipes.

¶ 53                                 h. Prior Conviction

¶ 54    The State introduced a certified copy of defendant's conviction for driving on a suspended license.

¶ 55                            2. *Defendant's Case-in-Chief*

¶ 56                                 a. Ashlee Didonato

¶ 57    Ashlee Didonato used to work with defendant at Aliano's Ristorante in Batavia.  She testified that he has a reputation for peacefulness and honesty in the community.  She had nothing bad to say about him and believes he is a great person.

¶ 58    Defendant worked as a bartender and server from 2014 to 2016.  Didonato had a friendship and a three-month dating relationship with him.  On September 3, 2018, she was dating defendant. She was not at 1331 Brandywine Circle that day.

¶ 59                                        b. Anne Lanute

¶ 60    Anne Lanute knows defendant and used to work with him at Eddie Merlot's in Warrenville for a few months in 2013. She has maintained a friendship with him, and she testified that he has a reputation for peacefulness and truthfulness. Lanute dated defendant for a few months in 2013. On September 3, 2018, Lanute was not at 1331 Brandywine Circle.

¶ 61                                c. Detective Jason Kaluzny

¶ 62    Batavia police detective Jason Kaluzny interviewed Rodriguez at the police station after the incident. Rodriguez did not tell Detective Kaluzny that defendant strangled or choked him during the first visit to his home. Rodriguez also did not say that another person was with defendant during the first entry or that this person said, "Please don't call the cops."

¶ 63                                        d. Defendant

¶ 64    Defendant, age 39, testified that Trynoski was his ex-girlfriend and had asked him to give her a second chance and "re-kindle" their relationship. They went camping together on Friday, August 31, 2018, and spent the next two days together.

¶ 65    At about 1 a.m. on September 3, 2018, defendant went to 1331 Brandywine because Trynoski was going to come by his place after moving her belongings out of Rodriguez's house. She was going to come by around midnight, and he texted her when she did not come to his house.

¶ 66    James Phillips, one of defendant's former employees, drove defendant to Rodriguez's house the first time. Defendant knocked on the front screen door, and Trynoski opened the main door. She then started to open the screen door, and defendant helped her open it. Defendant stated, "What's going on? You were supposed to be with me." Rodriguez approached and said, "What the hell is going on here?" Defendant testified that Trynoski replied, "He's not letting me leave right now." However, the trial court sustained the State's hearsay objection to this testimony.

Defendant testified that Trynoski did not leave with him. When asked why, the trial court sustained the State's hearsay objection when defendant started to testify about a statement Trynoski made.

¶ 67    During this first visit to Rodriguez's house, defendant spoke to Trynoski at the front door for about two or three minutes. He understood that Trynoski was going to calm down Rodriguez and then go to defendant's house. It would take no more than one hour. During this visit, defendant entered the residence about eight feet for one minute because Rodriguez told him to "F" himself and defendant asked him, "Are you going to let her leave[?]" No one told him that he could not enter the residence or blocked his entry. Defendant made physical contact with Rodriguez while in the home. Rodriguez, according to defendant, was extremely upset and had a "crazed look in his eyes." Defendant grabbed his shirt and said, "Are you going to let her leave." Rodriguez replied, "I'll do what I want." Defendant denied that he put his arm or hands around Rodriguez's neck and denied pushing, punching, or kicking Rodriguez. Trynoski, according to defendant, appeared worried. (On cross-examination, defendant testified that Trynoski stated that she would handle Rodriguez. When defendant grabbed Rodriguez's shirt, she stated, "Just go, and I'll handle him, and I'll be by you in an hour." Defendant agreed that he initiated contact with Rodriguez when he grabbed his shirt.)

¶ 68    Defendant left by himself. He testified that he was assured that Trynoski would be okay, that Rodriguez would calm down if he left, and that Trynoski would arrive at his house at 2 a.m.

¶ 69    Defendant went to his mother's home for one hour and then went home. His former employee was sleeping on the couch, and his cousin was in the basement rental unit. Defendant started texting Trynoski at 2:45 a.m. He sent about six texts and did not receive a response. Defendant also tried to call her about 10 times, but the calls went to her voicemail. He also called her mother. By 3:30 a.m., defendant was worried and had not heard back from Trynoski's mother.

A friend of defendant's cousin, who was at his house, drove defendant to Rodriguez's house and then the friend left.

¶ 70    During this second visit to Rodriguez's house, defendant saw that Trynoski's car was blocked by Scott's car. He loved Trynoski and was worried about her. Defendant walked up to the bay window at the front of the house, looked inside, and saw Trynoski on the living room couch. The living room light was off. He lightly tapped on the window, and Trynoski jumped up. She opened the front door, and defendant opened the screen door, stating, "What the hell is going on?" Defendant testified that Trynoski replied, "I couldn't leave." The court sustained the State's hearsay objection about her reply. Defendant further testified that Trynoski was worried and agitated, and defendant said, "Can we just go?" Defendant testified that his voice was not raised; he "was trying to keep it quiet."

¶ 71    When asked if Trynoski invited him into the home, defendant replied that she opened the door, he opened the screen door and stepped on the threshold, and Trynoski did not stand in his way. She did not hold out her arms, and defendant did not hear anyone say not to come in.

¶ 72    After about 5 or 10 seconds, Rodriguez ran from the hallway, screaming and holding what looked like a crowbar or pipe. Defendant extended his right arm, held his palm facing forward, and walked toward the living room/kitchen area to get between Trynoski and Rodriguez, as he was afraid for Trynoski's safety. He stated, "Calm down buddy. We're just going to go," and, "Put it down." He inched forward. Rodriguez screamed, "Why is he here?" Next, defendant got hit on the back of the head while near the living room wall and fell toward Rodriguez, who was in front of him, about five or six feet away. Defendant testified that he never saw Rodriguez raise the item he believed was a crowbar.

2021 IL App (2d) 190993-U

¶ 73    Defendant next wrestled Rodriguez and Scott.  Rodriguez held a cellphone that defendant thought belonged to Trynoski.  He grabbed it and threw it to her and told her to leave.  He was punched several times during the fight.  When defendant saw police lights, he tried to run toward them, but Rodriguez grabbed his ankles and Scott sat on his back.

¶ 74    Defendant testified that, at no time during his second visit did he bang on the windows or go to the side of the house.  At no point that morning did he go to the side door, pound on a door, kick a door, smash it, or break in.  Nor did he see anyone break in or hear pounding on doors or the side of the house.  Defendant denied strangling Rodriguez and denied breaking down the side door, either alone or with someone else.  Defendant testified that he did not have muddy shoes that day, and, at the police station, his shoes were taken away before he was placed in his cell.  He denied washing his shoes before being placed in the cell.

¶ 75    On cross-examination, defendant testified that he dated Trynoski for one year until the end of May.  During his first visit to Rodriguez's home, Phillips, his former employee who drove him there, came to the front door with him.  Defendant admitted that he made a statement at the police station, stating "It's my fault. I shouldn't have gone back there."  He also stated, "I understand why they probably thought I was a danger to them or [Trynoski], so they jumped on me," and "I don't blame them.  I was in there screaming at them an hour and a half before."

¶ 76                                    e. Joint Stipulation

¶ 77    The parties stipulated that assistant State's Attorney Vincent Coyle met with Rodriguez on July 3, 2019, to discuss the case.  Rodriguez did not say that, during the first visit, another person was with defendant, and Rodriguez never used the word "strangled."

¶ 78    As to the second visit, Rodriguez did not tell Coyle that defendant said, "You are going to give me everything."  Rodriguez did not mention, nor was he asked about, losing consciousness

or that he was about to lose consciousness. Nor did he say that defendant manipulated Rodriguez's body to make it appear that Rodriguez had been attacking defendant. Finally, Rodriguez never stated that defendant placed him on defendant.

¶ 79                    3. *Jury-Instructions Conference*

¶ 80    At the jury instructions conference, the State conceded that the jury should be instructed on self-defense but contended that defendant had not presented sufficient evidence to warrant a necessity-defense instruction. Specifically, the State argued that there was evidence that Trynoski was not forced to stay at Rodriguez's home and the evidence that her car was blocked was not sufficient to warrant the instruction. Defense counsel argued that the necessity-defense instruction was warranted as to the home-invasion charge because there was evidence that Trynoski was trapped—she wanted to leave, Rodriguez and Scott would not let her do so, her car was blocked, and she was scared. The trial court declined to give the instruction, finding that defendant did not admit to going to Rodriguez's house without authority, and, even if he did, he had not shown that the threat to Trynoski was immediate and that his conduct was the sole option to avoid greater injury. The court noted that defendant had the option of contacting the police or taking other steps, but did not do so.

¶ 81                    4. *Verdict and Subsequent Proceedings*

¶ 82    On July 16, 2019, the jury found defendant guilty of aggravated battery and home invasion. Defendant moved for a new trial, arguing that the trial court erred in sustaining the State's hearsay objections to defendant's testimony that Trynoski wanted to leave and that she could not leave.

¶ 83                    5. *Ineffective-Assistance Allegations*

¶ 84    On August 20, 2019, defendant, *pro se*, filed a 30-page motion for a new trial, arguing that trial counsel was ineffective, including for failing to (1) impeach the State's witnesses with their

criminal backgrounds; specifically, failing to investigate their backgrounds, including any charges that arose from the drugs found in Rodriguez's house and relating to defendant's claim that Trynoski violated her probation on a felony drug charge when she made a statement to police; (2) elicit testimony that the White Sox hat found at the scene and that was allegedly worn by the second assailant belonged to defendant and that Trynoski gave it to him as a gift; (3) introduce the remainder of the recorded call he made to Trynoski, because the context of the entire call was exculpatory; and (4) submit lesser-included-offense instructions for criminal trespass and battery.

¶ 85    The trial court conducted a preliminary *Krankel* inquiry to address defendant's claims. The court confirmed with defense counsel that he had sufficient opportunity to investigate the case, prepare for trial, and speak to defendant in preparation for trial. Counsel also confirmed that he had the criminal backgrounds of the witnesses prior to trial. When the trial court asked defense counsel if his cross-examination of the State's witnesses was based on trial strategy, counsel replied, "Yes," without elaboration. The court did not further question counsel and found that counsel's cross-examination of the witness as to their criminal backgrounds did not show possible neglect of the case. As to the drug-use allegations, the court found that, based on counsel's arguments concerning a motion *in limine* and the fact that defendant was allowed to bring out aspects of the alleged drug use in the home during trial, there was no merit to his ineffective-assistance claims. The court asked counsel whether, if Trynoski was on probation at the time of trial, counsel's decision not to impeach her with this information was based on trial strategy. Counsel replied, "That is correct," without elaboration. The court did not further question counsel and found that the claim lacked merit.

¶ 86    As to the White Sox hat, the court found that the testimony did not support defendant's assertion that the hat was the only proof that another person assisted defendant. The court

determined that there was other evidence that another person assisted him and, thus, no possible neglect was shown.

¶ 87    The court also rejected defendant's argument concerning the recorded phone call between defendant and Trynoski, finding that defense counsel sufficiently argued a pre-trial motion concerning the call.  The court also noted that, prior to its presentation at trial, it had reviewed the call and had ordered some portions to be redacted.

¶ 88    Finally, on the lesser-included-offense-instructions issue, the court confirmed with defense counsel that he discussed such instructions with defendant.  The court asked counsel if his decision not to tender such instructions was trial strategy, and counsel replied, "Yes," without elaboration. Without further examination, the court determined that defendant's claims did not show possible neglect of the case.

¶ 89    The court noted that, overall, based upon its knowledge of defense counsel's performance at trial and counsel's responses at the hearing, defendant's claims pertained to matters of trial strategy.  Accordingly, it declined defendant's request to appoint *Krankel* counsel for an evidentiary hearing.

¶ 90                              6. *Sentence*

¶ 91    The trial court sentenced defendant to 7½ years' imprisonment on the home-invasion count and 3 years' imprisonment on the aggravated-battery count, with the sentences to run concurrently. The court denied defendant's motion to reconsider sentence.  Defendant appeals.

¶ 92                              II. ANALYSIS

¶ 93                    A. Hearsay Rulings & Necessity Defense

¶ 94    Defendant argues first that he was denied a fair trial when the trial court erroneously barred testimony that supported his necessity defense and then refused to give the jury a necessity instruction.  For the following reasons, we reject defendant's argument.

¶ 95    Evidentiary rulings are within the trial court's sound discretion and will not be reversed unless the court has abused that discretion.  *People v. Reid*, 179 Ill. 2d 297, 313 (1997).  An abuse of discretion will be found only where the trial court's ruling was unreasonable.  *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 96    Here, defendant maintains that *de novo* review is appropriate because the trial court incorrectly barred as hearsay the testimony regarding Trynoski's statements.  We disagree.  Although a court's ruling based on an incorrect rule of law is reviewed *de novo*, we cannot say that is the case here.  *People v. Caffey*, 205 Ill. 2d 52, 89 (2001) (where court bases ruling on the specific circumstances of case and not on a broadly applicable rule, abuse-of-discretion review applies).

¶ 97    The necessity defense is codified in section 7-13 of the Criminal Code of 2012, which states: "Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his [or her] own conduct."  720 ILCS 5/7-13 (West 2020).

¶ 98    At trial, defense counsel argued that a necessity instruction was warranted on the home-invasion charge because Trynoski testified that she wanted to leave, believed that Rodriguez and Scott were not letting her leave, and that her car was blocked.  She also testified that she was scared for her safety, was not responding to any phone calls, and Rodriguez was acting erratically.  The State took the position that Trynoski was not forced to stay at Rodriguez's house, and, although

her car was blocked, she was able to leave after she contacted her mother. In denying defendant's request for the instruction, the trial court noted that defendant did not admit going into the home without authority and took the position that no one had blocked him or said he could not enter. Also, the court determined that there was no evidence that any threat was immediate and that defendant's conduct was the sole option. Defendant, the court noted, testified that he was in fear for Trynoski from 3:30 a.m. onward, but he did not contact the police or take other steps besides going to Rodriguez's home and entering it.

¶ 99    Here, defendant argues that the instruction was warranted because Rodriguez and Scott would not let Trynoski leave, and defendant feared for her safety. The only evidence that defense counsel could point to in support, he maintains, was the fact that Trynoski's car was blocked in by Scott's car. Defense counsel, defendant notes, had repeatedly attempted to elicit testimony from defendant that Trynoski told him the brothers were holding her against her will. The trial court, he asserts, erroneously sustained hearsay objections to the statements, which denied him his ability to present a necessity defense. Defendant contends that the statements were not hearsay.

¶ 100    The first statement to which defendant points is his testimony that, during his first visit to Rodriguez's house, he asked Trynoski what was going on and, when Rodriguez approached and asked what "the hell" was going on, Trynoski allegedly replied, "He's not letting me leave right now[.]" The trial court sustained the State's hearsay objection to her purported reply. Defendant argues that the statement's relevance did not depend on the truth of the matter asserted, but the effect it had on him. Even if Trynoski's statement was not true, he argues, his actions might have been justified if he believed her statement. The second hearsay ruling that defendant argues was erroneous was his testimony that, during his second visit to Rodriguez's house, after he opened the screen door and asked what was going on, Trynoski allegedly replied, "I couldn't leave." The

court sustained the State's hearsay objection to Trynoski's alleged reply. Defendant contends that, if both statements had been admitted, then he would have been entitled to a necessity instruction.

¶ 101 " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Although hearsay is generally inadmissible (see Ill. R. Evid. 802 (eff. Jan. 1, 2011)), various exceptions exist, including an out-of-court statement offered to prove its effect on a listener's mind or to show why the listener subsequently acted as he or she did. *People v. Thomas*, 296 Ill. App. 3d 489, 499 (1998).

¶ 102 We conclude that both statements were hearsay. Defendant's first statement—that Trynoski purportedly stated, "He's not letting me leave right now"—was hearsay because it was only offered by defendant for the truth of the matter asserted, *i.e.*, to show that Trynoski was being prevented from leaving Rodriguez's house. At trial, only defendant asserted that Trynoski made the statement. With the statement, which is not necessarily on its own indicative that she was being held against her will (for example, she could have been delayed due to issues related to removing her belongings from the house), defendant was attempting to rebut testimony from Trynoski that she was not forced to stay in Rodriguez's house against her will. Trynoski testified that she did not invite defendant in during the first visit and that she tried to close the door as he came through it. "I was telling him that I would talk to him later and I would handle the situation, because I was trying to get my stuff out and go home." Furthermore, the recorded telephone conversation between defendant and Trynoski supported this, as Trynoski resisted defendant's urging to assert that she was being held against her will: she stated that she had already told police the truth. There is no indication in Trynoski's testimony or the recording that she believed she was being held against her will, and she testified that she was not forced to stay. For the same

reason, defendant's second statement concerning Trynoski's purported reply—"I couldn't leave"—was also hearsay because it was offered for the truth of the matter asserted, *i.e.*, that Trynoski could not leave. Defendant's testimony was again offered to attempt to rebut Trynoski's testimony that she was not forced to stay in Rodriguez's home and to show that defendant was justified in entering the house and for his subsequent conduct. On its own, the second statement does not necessarily reflect that Trynoski was being forced to remain at Rodriguez's house.

¶ 103   Having determined that both statements were hearsay, we next turn to the effect-on-the-listener exception. We conclude that defendant forfeited his argument concerning this exception, because defense counsel failed to contemporaneously argue that this exception applied to show that Trynoski's statements were admissible. Although counsel did raise the court's hearsay rulings in a posttrial motion, this was not sufficient to preserve the issue for our review. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve issue for appellate review, a defendant must both raise the issue contemporaneously during the proceedings and in a posttrial motion). Defendant contends that we can nevertheless reach the issue because defense counsel was ineffective for not contemporaneously making the argument.

¶ 104   A defendant has a constitutional right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *People v. Domagala*, 2013 IL 113688, ¶ 36. Claims of ineffective assistance of counsel are governed by the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984); see also *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting *Strickland*). To succeed on a claim of ineffective assistance of counsel, a defendant must show that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687. To satisfy the deficiency prong of *Strickland*, the defendant must demonstrate that counsel's performance

was so "inadequate 'that counsel was not functioning as the "counsel" guaranteed by the sixth amendment.' " *People v. Dupree*, 2018 IL 122307, ¶ 44 (quoting *People v. Evans*, 186 Ill. 2d 83, 93 (1999)). To satisfy *Strickland*'s prejudice prong, the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"; a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A defendant must satisfy both *Strickland* prongs, and a failure to satisfy one of the prongs precludes a finding of ineffectiveness. *People v. Simpson*, 2015 IL 116512, ¶ 35. Whether a defendant sufficiently alleges ineffective assistance of counsel is a legal question subject to *de novo* review. *People v. Taylor*, 237 Ill. 2d 68, 75 (2010).

¶ 105 Defendant argues that counsel's failure to contemporaneously argue that the statements were not hearsay was not based on trial strategy, which is generally immune from ineffective-assistance claims. Counsel, he notes, made the proper argument in the posttrial motion. He also contends that Trynoski's statements that Rodriguez and Scott would not let her leave were essential to his necessity defense—that he entered the house because Trynoski was being held against her will and defendant feared for her safety. Defendant also argues that her purported statements were directly related to his state of mind when he entered the house and, thus, counsel's failure to argue that the statements were not hearsay was objectively unreasonable.

¶ 106 Turning to prejudice, defendant asserts that admission of the statements would have allowed the defense to have the jury instructed on the necessity defense. He maintains that there is a reasonable probability that the result of the trial would have been different had the jury heard Trynoski's statements and been instructed on necessity. The case, in his view, came down to competing narratives and was, thus, closely balanced. He testified that he entered Rodriguez's house because he feared for Trynoski's safety. Trynoski's excluded statements, he contends,

would have put his actions in a different light: Rodriguez's brandishing of a weapon could be viewed as threatening to Trynoski if the jurors heard that she was being held against her will.

¶ 107 We conclude that defendant's claims are unavailing because he could not have been prejudiced by defense counsel's failure to contemporaneously raise the effect-on-the-listener exception to the hearsay rule. Even if the statements had been admitted, the evidence would not have warranted an instruction on the necessity defense.

¶ 108 "The giving of jury instructions is a matter within the sound discretion of the trial court." *People v. Jones*, 219 Ill. 2d 1, 31 (2006). However, "[i]t is a matter of law whether the defendant has met the evidentiary minimum entitling [her] to instructions on an affirmative defense." *People v. Everette*, 141 Ill. 2d 147, 157 (1990). "A defendant is entitled to an instruction on his [or her] theory of the case if there is some foundation for the instruction in the evidence, and if there is such evidence, it is an abuse of discretion for the trial court to refuse to so instruct the jury. [Citation.] Very slight evidence upon a given theory of a case will justify the giving of an instruction." *People v. Jones*, 175 Ill. 2d 126, 131-32 (1997).

" 'In essence, unless the evidence before the trial court is so clear and convincing as to permit the court to find as a matter of law that there is no affirmative defense, the issue of whether a defendant should be relieved of criminal liability by reason of his [or her] affirmative defense must be determined by the jury with proper instruction as to the applicable law.' *People v. Jones*, 175 Ill. 2d at 132. When the evidence raises the basis for the instruction, a trial court's refusal results in a denial of defendant's due process and entitles a defendant to a new trial. *Id.* at 134." *People v. Hari*, 218 Ill. 2d 275, 296-97 (2006).

¶ 109 The necessity defense applies when the threat of harm was immediate, and defendant's conduct was the sole option to avoid injury. *People v. Azizarab*, 317 Ill. App. 3d 995, 998-99 (2000). Conduct that would otherwise be illegal is justified by necessity only if the conduct was the sole reasonable alternative available to the defendant under the circumstances. See *People v. Guja*, 2016 IL App (1st) 140046, ¶¶ 47-49. When other alternatives exist, which if carried out would cause less harm, then the accused is not justified in breaking the law. *People v. Haynes*, 223 Ill. App. 3d 126, 128 (1991). The necessity defense "is viewed as involving the choice between two admitted evils where other optional courses of action are unavailable, and the conduct chosen must promote some higher value than the value of literal compliance with the law [citation]." *People v. Janik*, 127 Ill. 2d 390, 399 (1989). Defendant sought a necessity-defense instruction on the home-invasion charge. Home invasion requires that a person knowingly enter the dwelling place of another without authority. 720 ILCS 5/19-6(a) (West 2020).

¶ 110 Here, there was no slight evidence that defendant was "without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his [or her] own conduct." 720 ILCS 5/7-13 (West 2020). As the State notes, defendant admitted at trial to giving a statement to the police, stating, "It's my fault. I shouldn't have gone back there." He also stated, "I understand why they probably thought I was a danger to them or [Trynoski], so they jumped on me," and "I don't blame them. I was in there screaming at them an hour and a half before." Nor was there any evidence, as the trial court found, that defendant sought alternatives to going to Rodriguez's home. Defendant could have contacted law enforcement, but did not do so.

¶ 111 Also, there was no slight evidence of any immediate threat to Trynoski or that defendant's conduct was the sole option to avoid the alleged harm. As to defendant's first visit to Rodrgiuez's

home, defendant testified that he went to Rodriguez's house around 1 a.m. to check on Trynoski after he had not heard back from her. He did not state that he was concerned about her well-being. After Trynoski answered the door, they spoke and he understood that she was going to calm down Rodriguez, who appeared upset to defendant and had a "crazed look in his eyes," and then go to defendant's house. Defendant testified that he *initiated* contact with Rodriguez, grabbing his shirt and asking him if he was going to let Trynoski leave. According to defendant, after Rodriguez replied that he would do what he wanted, no fight ensued; rather, Trynoski told him that she would handle Rodriguez and go to defendant's home in one hour. Defendant stated that he then left. We believe that, *even if Trynoski stated that Rodriguez was not letting her leave* when defendant came to the door, this did not constitute evidence of any immediate danger to her that warranted defendant initiating contact with Rodriguez, especially when he acknowledged that Trynoski told him she would handle Rodriguez. Further, Trynoski's testimony supports that she was not in danger. She testified that she was undecided if she would go to defendant's bonfire, yet defendant was very upset when defendant came to the door. He entered the house when he saw Rodriguez approach and as Trynoski was trying to close the door to keep defendant out. She fell as she tried to close the door and testified that she did not invite defendant into the home. When she turned around, she saw defendant and Rodriguez fighting. Another man had followed defendant into the house. Trynoski told them to stop fighting, but defendant yelled at her. Rodriguez told defendant to leave, and defendant and the other man left.

¶ 112 Defendant did not contact law enforcement after this encounter. Instead, he returned to Rodriguez's home. Once he arrived the second time, he looked through the front window and saw Trynoski laying on the couch, which was not an indication that she was in any danger. He walked in. Defendant testified that Trynoski purportedly stated that she could not leave. *Even if she made*

*this statement*, it did not reflect that she was in any immediate danger. According to defendant, Rodriguez approached, holding a weapon, and he feared for Trynoski's safety. However, he, again, admitted to police that he should not have returned to Rodriguez's house, that "they probably thought I was a danger to them or [Trynoski], so they jumped on me," and, "I don't blame them. I was in there screaming at them an hour and a half before." Defendant's statements do not reflect that Rodriguez (or even Scott) was the threat to Trynoski. Trynoski testified that her car was blocked after Scott arrived at Rodriguez's house, but that they did not force her to stay. After speaking with her mother on the phone, her mother came and picked her up. During the second visit, she testified that she heard the side door crash against the cabinet and believed that someone had broken in. She heard Rodriguez and Scott yelling at the people outside not to come in. Again, no evidence suggested that Rodriguez or Scott were a threat to Trynsoki.

¶ 113   In sum, even considering the hearsay statements, defendant was not prejudiced by defense counsel's failure to contemporaneously raise the hearsay objection, because the evidence was not sufficient to warrant a necessity-defense instruction.

¶ 114                                   B. *Krankel* Inquiry

¶ 115   Next, defendant asserts that the court's preliminary *Krankel* inquiry was inadequate, because the court overlooked or misunderstood some of his claims and relied on defense counsel's general assertion of trial strategy to dismiss the claims that showed possible neglect. He asks that we remand for a proper *Krankel* hearing. For the following reasons, we conclude that one of defendant's claims has potential merit, and we remand for a proper preliminary *Krankel* inquiry.

¶ 116   We review *de novo* whether the trial court properly conducted a *Krankel* inquiry. *People v. Roddis*, 2020 IL 124352, ¶ 33. If the trial court did so and reached a determination on the merits of the defendant's ineffective-assistance claims, we will reverse only if the determination was

manifestly erroneous. See *People v. McCarter*, 385 Ill. App. 3d 919, 941 (2008) (trial court's ruling in preliminary *Krankel* inquiry that is based on its assessment that ineffective-assistance claim was "spurious" will be reversed where it is manifestly erroneous). Manifest error is error that is "clearly evident, plain, and indisputable." *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997).

¶ 117　A common-law procedure has developed following our supreme court's *Krankel* decision, and it "is triggered when a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel." *People v. Jolly*, 2014 IL 117142, ¶ 29. Under the common-law procedure, the trial court must first (in what is called the preliminary inquiry), at a minimum (*People v. Roddis*, 2020 IL 124352, ¶ 54) examine the factual basis of the defendant's claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). Further, "a trial court [is] able to consider the merits in their entirety when determining whether to appoint new counsel[.]" (Emphasis in original.) *Roddis*, 2020 IL 124352, ¶ 61. If the court determines that the claim lacks merit or pertains only to matters of trial strategy, it need not appoint new counsel and may deny the defendant's *pro se* motion. *Moore*, 207 Ill. 2d at 78. "A claim lacks merit if it is conclusory, misleading, or legally immaterial or does not bring to the trial court's attention a colorable claim of ineffective assistance of counsel." *People v. McLaurin*, 2012 IL App (1st) 102943, ¶ 40.

¶ 118　However, if the allegations show "possible neglect" of the case, then new counsel should be appointed. *Id.* Following the appointment of counsel (*Krankel* counsel), the case proceeds to the second *Krankel* stage, which consists of an adversarial and evidentiary hearing on the defendant's claims and during which *Krankel* counsel represents the defendant. *People v. Downs*, 2017 IL App (2d) 121156-C, ¶¶ 43, 47 (*Krankel* counsel acts as "an advocate for the defendant, not for the State or the trial court") (emphasis omitted). At the second-stage adversarial hearing, *Krankel* counsel must independently review the defendant's *pro se* ineffective-assistance

allegations and then must present any nonfrivolous claims (*i.e.*, those with an arguable basis in law or in fact) to the trial court. *Id.* ¶¶ 49-50, 54.

¶ 119  This case, again, involves a preliminary *Krankel* inquiry. The preliminary inquiry's purpose is to allow the trial court to ascertain the factual basis for the defendant's claims and to afford the defendant the opportunity to explain and support his or her claims. *People v. Ayres*, 2017 IL 120071, ¶ 24. In this way, the court can determine whether to appoint independent counsel to argue the defendant's claims. *People v. Patrick*, 2011 IL 111666, ¶ 39. "By initially evaluating the defendant's claims in a preliminary *Krankel* inquiry, the circuit court will create the necessary record for any claims raised on appeal." *Jolly*, 2014 IL 117142, ¶ 38; see also *People v. Jackson*, 2020 IL 124112, ¶ 95. "[T]he inquiry is not burdensome upon the circuit court, and the facts and circumstances surrounding the claim will be much clearer in the minds of all involved when the inquiry is made just subsequent to trial or plea, as opposed to years later on appeal." *Ayres*, 2017 IL 120071, ¶ 21. The trial court can "base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 79. The "preliminary *Krankel* inquiry should operate as a neutral and nonadversarial proceeding" and, because the defendant is not appointed counsel at this stage, the State's participation, if any, must be *de minimus*. *Jolly*, 2014 IL 117142, ¶ 38.

¶ 120  As the defendant need only raise a colorable claim of ineffective assistance at a preliminary *Krankel* inquiry, the correct inquiry, in determining whether there was "possible neglect," is to ask whether defense counsel's performance was arguably ineffective. See *McLaurin*, 2012 IL App (1st) 102943, ¶ 40 (claim lacks merit if it "does not bring to the trial court's attention a colorable claim of ineffective assistance of counsel"). Again, claims of ineffective assistance of counsel are

generally considered under the familiar standard established in *Strickland*, 466 U.S. at 687-94. *Albanese*, 104 Ill. 2d at 526-27.

¶ 121                    1. Failure to Impeach the State's Witnesses

¶ 122    Defendant argues that the court should have made further inquiry into why defense counsel chose not to impeach the State's witnesses with their criminal backgrounds and should not have relied on counsel's blanket assertion that his cross-examination was a matter of trial strategy. This was especially so in this case, he asserts, where the jury was presented with competing narratives and defense counsel's strategy was to argue that the State's witnesses were not credible.

¶ 123    We reject defendant arguments. First, a pretrial ruling precluded defense counsel from questioning the witnesses about drug evidence found in Rodriguez's home following the incident, specifically, pipes and an "ordinance amount of cannabis" in Rodriguez's bedroom and a "large amount of cannabis and Ketamine" in his roommate Justin's bedroom. Defense counsel did elicit from Rodriguez on cross-examination that he told the prosecutors that he did not call the police because he had marijuana in the house. Counsel also questioned Trynoski on cross-examination about marijuana in the house, and she confirmed that it was present in the house.

¶ 124    The State contends, and we agree, that defense counsel's decision not to inquire into Trynoski's probation status was reasonable, because her status risked negatively impacting defendant's case due to his relationship with Trynoski and their feelings about one another. Finally, we note that counsel confirmed that he possessed records of the witnesses' criminal backgrounds and confirmed for the court that the manner in which he cross-examined and impeached them were matters of trial strategy. The trial court, in announcing its decision on defendant's *pro se* motion, specifically noted that, overall, it based its ruling on its knowledge of counsel's trial performance and counsel's responses during the *Krankel* inquiry. On this issue,

this was sufficient. See *Moore*, 207 Ill. 2d at 79 (court may base its assessment on its knowledge of counsel's trial performance "and the insufficiency of the defendant's allegations on their face").

¶ 125                    2. Failure to Adequately Inquire About White Sox Hat

¶ 126   Next, defendant argues that the court did not adequately inquire into his allegations about the White Sox hat found at the scene. Scott testified that the second person with defendant wore the hat, and the State argued that recovery of the item corroborated its theory that defendant and another person broke into Rodriguez's house and attacked him and Scott. Defendant testified that he was alone during the second visit, and defense counsel argued that there was no one with defendant, referring to the State's theory as a "phantom" person aiding in the attack. Defendant notes that, in his *pro se* motion, he alleged that he told defense counsel that the hat was his, it was a gift from Trynoski, and that he was wearing it that evening. He asserted that counsel was ineffective for not eliciting testimony that would have undercut the State's proof of the second assailant.

¶ 127   Further, defendant contends that the trial court failed to ask defense counsel if defendant told him that the hat was his and that Trynoski could confirm this fact. Instead, defendant argues, the court merely stated that there were witnesses who testified that another person was present, so there was no support for the claim that counsel's cross-examination was insufficient. Defendant argues that this inquiry was inadequate. Defendant testified that he was alone, and the State's witnesses testified that defendant and another person acted in concert. The hat, he further notes, was used to support the State's theory, and defense counsel argued the "phantom" theory.

¶ 128   During the *Krankel* inquiry, the court found that the testimony did not support defendant's assertion that the hat was the only proof that another person assisted defendant. The court

determined that there was other evidence that another person assisted him and, thus, no possible neglect was shown.

¶ 129   We conclude that there was no error.  Three witnesses testified that another man was with defendant: Rodriguez, Scott, and Trynoski.  Rodriguez testified that another man was with defendant.  Scott testified that, during the second visit, two men entered Rodriguez's home and that the person who choked him wore a White Sox hat and ran out the door when police approached.  Trynoski testified that, during the second visit, she heard multiple voices outside the house yelling for her.  Furthermore, defendant himself testified that his cousin's friend drove him to Rodriguez house the second time defendant went there, although the friend left.  Detective Miller saw a White Sox hat in Rodriguez's kitchen after the incident.  The trial court's ruling was not erroneous, because there was ample additional evidence that another man was with defendant during the incident.  The hat's association with defendant was not critical to impeaching the three witnesses' testimony about the second man.  Thus, there was no possible neglect by defense counsel.

¶ 130          3. Failure to Offer Exculpatory Evidence – Recorded Phone Call

¶ 131   Defendant next argues that the trial court failed to adequately inquire into his allegation that the rest of the recorded phone call should have been admitted because it would have provided context that was exculpatory.  The court, he notes, merely noted that defense counsel litigated the admissibility and redaction of the call before trial.  The court, defendant argues, should have questioned counsel and defendant to determine whether playing the rest of the tape for the jury could have been beneficial.

¶ 132   In ruling on defendant's *pro se* motion, the trial court found that defense counsel had sufficiently argued a pre-trial motion concerning the call and determined that defendant's claim lacked merit.

¶ 133   We decline to reach the merits of defendant's argument. In his briefs, defendant fails to specify precisely what exculpatory information is contained in the recorded call. Thus, he essentially asks us to formulate a specific meritorious argument for him. We decline to do so. *People v. Chatman*, 357 Ill. App. 3d 695, 703 (2005) (appellant must present clearly defined issues to the court; court is not merely a repository in which appellants may dump the burden of argument and research). Because defendant fails to identify in his briefs the language in the call that is exculpatory, he has forfeited his argument.

¶ 134              4. Failure to Proffer Lesser-Included-Offense Instructions

¶ 135   Finally, defendant argues that the court's inquiry into the lesser-included-offense instructions for criminal trespass and battery was insufficient, because the court failed to inquire as to whether defense counsel told defendant that the decision whether to tender the instructions was ultimately his and whether defendant made an informed decision to forego the lesser-included instructions. We agree.

¶ 136   At the preliminary inquiry, the trial court confirmed with defense counsel that he had *discussed* the instructions with defendant. The court asked counsel if his decision not to tender such instructions was trial strategy, and counsel replied, "Yes," without elaboration. Without further examination, the court determined that defendant's claims did not show possible neglect of the case. In his *pro se* motion, defendant had asserted that defense counsel did not offer the instructions "as planned before trial" and that they should have been offered.

¶ 137   "[T]he decision whether to tender a lesser-included offense instruction partakes of, and is unavoidably intertwined with, strategic trial calculations, matters within the sphere of trial counsel." *People v. Medina*, 221 Ill. 2d 394, 406 (2006).  See also *People v. Walton*, 378 Ill. App. 3d 580, 589 (2007) ("Counsel's decision to advance an 'all-or-nothing defense' has been recognized as a valid trial strategy[.]").  However, the ultimate decision to tender an instruction on a lesser-included offense belongs to a defendant rather than defense counsel.  *People v. Brocksmith*, 162 Ill. 2d 224, 229 (1994) (counsel tendered lesser-included instruction without the defendant's knowledge or consent).  See, *e.g.*, *People v. Williams*, 275 Ill. App. 3d 242, 247 (1995) (reversal would be warranted if the record showed the ultimate decision not to submit an instruction was made as a matter of trial strategy by trial counsel).

¶ 138   Here, the court did not ask counsel whether defendant ultimately made the decision, and defendant himself claimed in his *pro se* motion that he wanted counsel to tender the lesser-included instructions.  We agree with defendant that the court's question about trial strategy did not address the issue defendant raised.  Accordingly, the court erred in conducting the preliminary *Krankel* inquiry and we remand this case so that the court can conduct a proper preliminary inquiry.  *People v. Mourning*, 2016 IL App (1st) 140270, ¶ 23.

¶ 139                                    III. CONCLUSION

¶ 140   For the reasons stated, the judgment of the circuit court of Kane County is affirmed in part, reversed in part, and remanded with directions.

¶ 141   Affirmed in part and reversed in part.  Cause remanded with directions.